Angel ORTIZ, et al., Plaintiffs,

v.

CITY OF PHILADELPHIA OFFICE OF the CITY COMMISSIONERS VOTER REGISTRATION DIVISION, et al., Defendants.

No. 91–6681.

United States District Court, E.D. Pennsylvania.

May 28, 1993.

Gullermo L. Bosch, Laureda & Bosch, Philadelphia, PA, Deborah H. Karpatkin, Arthur A. Baer, Puerto Rican Legal Defense & Educ. Fund, Inc., New York City, Eric B. Schnurer, Philadelphia, PA, for plaintiffs.

Thomas J. Wamser, Michael F. Eichert, Deputy City Sols., Philadelphia, PA, for defendants.

### *MEMORANDUM*

BUCKWALTER, District Judge.

This action is presently before the Court following a nonjury trial which was held in November, 1992. After hearing the evidence, the parties submitted post trial briefs outlining the relevant factual and legal issues to be considered by the Court. The issues are now ripe for review. In ruling upon the issues presented by the parties, the Court relies upon the evidence presented at trial and the parties' post trial memoranda.

The plaintiffs in this action include City of Philadelphia Councilman Angel Ortiz, who has served on the Philadelphia City Council since 1988; Project VOTE, a national, nonpartisan, nonprofit organization, founded in 1981 to increase voter participation through voter registration drives; and Service Employees International Union (SEIU) Local 36, which represents janitorial employees in the City of Philadelphia, approximately sixty percent of whom are African–American or minority. The defendant is the City of Philadelphia Office of City Commissioners, Voter Registration Division, the city agency responsible for implementing the city's election procedures.

Plaintiffs challenge the validity of the Pennsylvania voter purge law, 25 P.S. § 623–40, pursuant to § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., and the First and Fourteenth Amendments of the United States Constitution. Plaintiffs allege that implementation of the voting purge law has had a discriminatory impact upon African–American and Latino voters in Philadelphia in contravention of the Voting Rights Act. To support this contention, plaintiffs introduced statistical evidence indicating that African–American and Latino voters are purged from the voter registration rolls at significantly higher rates than white voters. Plaintiffs augment this statistical evidence by asserting that minorities in Philadelphia have experienced historical voting related discrimination that has been characterized by overt and subtle racial appeals in electoral campaigns, difficulty in electing minorities to office, racially polarized voting, and a discriminatory candidate slating process.

Additionally, plaintiffs assert that the defendant's failure to use a less discriminatory alternative to maintain accurate voter registration rolls violates the First and Fourteenth Amendments of the Constitution. Plaintiffs, however, recognize that this issue has been previously decided by the Court in its Memorandum and Order dated October 29, 1991, in which I denied plaintiffs' request for a preliminary injunction based upon arguments that the purge law violated the First Amendment. For the purposes of this memorandum, my analysis will focus principally upon plaintiffs' allegations that the purge law violates § 2 of the Voting Rights Act, and incorporates this Court's prior Memorandum and Order addressing the First Amendment issue as if set forth fully herein. *See* Appendix A.

Plaintiffs presently seek a permanent injunction to preclude the City of Philadelphia from purging voters for failure to vote. Conversely, defendant moves for judgment as a matter of law, asserting that the plaintiffs have failed to establish that there has been an abridgement or denial of the right to vote in contravention of the Voting Rights Act or the First and Fourteenth Amendments.

For the following reasons, plaintiffs' request for a permanent injunction to preclude the city from purging voters for failure to

vote is denied, and defendant's motion for judgment as a matter of law is granted.

## I. PROCEDURAL HISTORY

Plaintiffs began challenging the validity of the voter purge law in October, 1991. Plaintiffs, along with additional plaintiffs in a companion case, *Tucker v. City of Philadelphia*, No. 91–6123, 1991 WL 225005, initially moved for a preliminary injunction, arguing that the purge statute violated the First and Fourteenth Amendments of the Constitution and the Voting Rights Act. After a hearing on this issue, this Court denied plaintiffs' request for injunctive relief, concluding that the statute did not violate the First and Fourteenth Amendments, and further, that plaintiffs failed to produce evidence sufficient to establish that the statute violated the Voting Rights Act.

Although the *Tucker* plaintiffs have not pursued any additional legal remedies since the Court declined to issue a preliminary injunction, the *Ortiz* plaintiffs continued to pursue legal recourse. Approximately one month prior to the November, 1992 elections, plaintiffs moved for a temporary restraining order, or in the alternative, for a preliminary injunction and immediate hearing on the merits of their motion. This Court's order, dated October 6, 1992, denied plaintiffs' request for a temporary restraining order and preliminary injunction, based upon the reasoning of this Court's prior Memorandum and Order of October, 1991. A trial was originally scheduled prior to the November election, but continued at the request of plaintiffs. It was then rescheduled for November 10, 1992, after the election. In the interim, plaintiffs appealed to the Third Circuit Court of Appeals. The Third Circuit denied plaintiffs' request for injunctive relief based upon the plaintiffs' failure to timely prosecute. *Ortiz v. City of Philadelphia*, No. 92–1822, (3d Cir., Dec. 17, 1992). The trial was held for four days beginning on November 10, 1992 and concluding on November 13, 1992.

## II. PRELIMINARY FACTS

The city of Philadelphia's voter registration information is maintained by the Office of City Commissioners, Voter Registration Division. Philadelphia residents who are interested in registering to vote have the option of registering in person or registering by mail. In addition, numerous non-profit, political, and civic organizations sponsor voter registration drives which serve as an additional alternative for city residents to register to vote.[1] Voter registration forms are generally provided in English only, but the voter registration division will provide bilingual forms to organizations or individuals who register bilingual populations.

In an effort to maintain accurate voter registration information, the Pennsylvania legislature has enacted legislation designed to improve the registration process and reduce the likelihood of fraudulent registrations. One of the more controversial procedures used by Pennsylvania to maintain accurate voter registration rolls is the voter purge law, 25 P.S. § 623–40. Pursuant to this provision, electoral authorities throughout the state are authorized to remove registered voters from the voter registration rolls for failure to vote within two years. Once removed, voters must re-register in order to exercise their right to vote in an upcoming election.

Plaintiffs challenge the validity of the Pennsylvania voter purge statute, alleging that the operation of the statute denies African–American and Latino voters in the City of Philadelphia equal opportunity to participate in the political process and to elect representatives of their choice in contravention of the Voting Rights Act. Although this statute has been effective for approximately forty years, plaintiffs' action represents the first occasion for this Court to consider

1. Once completed, voter registration applications will only be rejected for one of the following reasons: (1) there is no indication of political party affiliation or non-affiliation; (2) there is no date of birth (unless the registrant stated that they are older than 18 or 21); (3) there is no signature; or (4) there is an invalid address. Approved applications are forwarded to the Data Processing Unit where the information from the registration affidavit is entered into a computer system. The original affidavit is filed in a binder by ward and division, and a duplicate copy of the registration affidavit is forwarded to the Records Unit, where it is filed alphabetically.

whether the statute violates § 2 of the Voting Rights Act.[2]

Section 623–40 provides that:

[d]uring each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the commission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two immediately preceding calendar years, and that his registration will be canceled if he does not vote in the next primary or election or unless he shall, within ten days of the next primary or election, file with the commission, a written request for reinstatement of his registration, signed by him, setting forth his place of residence. A list of the persons to whom such notices have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members. At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be canceled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The official registration application card of an elector who has registered may qualify as a reinstatement of his registration or a removal notice. The cancellation of the registration of any such elector for failure to vote during the two immediately preceding calendar years shall not affect the right of any such elector to subsequently register in the manner provided by this act. Whenever the registration of an elector has been canceled through error, such elector may petition the commission for the reinstatement of his registration not later than the tenth day preceding any primary or election, and after a hearing on said application, if error on the part of the commission is proved, the commission shall reinstate the registration of such elector.

As amended 1976, July 1, P.L. 476, No. 122, § 22 effective in 30 days; see 25 P.S. § 623–40.

Procedurally, each year in January, the voter registration division conducts a computer search to identify registered voters who have failed to vote in a primary or general election within the previous two years. Voters who are identified by this computer search are "flagged for purging," i.e., the computer inserts an "F-code" in the computer file of each person identified. An "intent to purge" list is then created based upon all "F-coded" files.

Voters appearing on the intent to purge list are mailed an "intent to purge notice," which provides as follows:

### NOTICE OF FAILURE TO VOTE WITHIN TWO YEARS:

To The Person Whose Name Appears on The Face of This Card:

Our Records indicate you have failed to vote for the last two years. As required by law, we will cancel your Registration, *unless you vote in the next Primary or Election or File with this Commission a written request for Reinstatement (10) days prior to the next Primary or Election,* signed by you, giving your present residence. This is the only notice you will receive ...

Defendant's Ex. No. 3 (*emphasis added*).

Once the voter receives an intent to purge notice, the voter has two options to avoid being purged: vote in the next election, or request reinstatement in writing. Voters who fail to exercise either option are purged from the voter rolls: the voter's computer file will be deleted and the voter's affidavit will be removed from the ward binders. Once purged, voters must re-register to vote, but they do not face any additional impedi-

---

**2.** There have been several constitutional challenges to the Pennsylvania voter purge law. *See Brier v. Luger,* 351 F.Supp. 313 (M.D.Pa.1972) (plaintiffs failed to produce sufficient evidence that operation of the purge violated plaintiffs' constitutional rights); *Williams v. Osser,* 326 F.Supp. 1139 (E.D.Pa.1971) (preliminary injunction to restore list of voters stricken pursuant to Pennsylvania voter purge law denied); *Williams v. Osser,* 350 F.Supp. 646 (E.D.Pa.1972) (Pennsylvania purge provision constitutional).

ments to re-registration as a result of being purged.

Over the past several years, approximately eighty-nine percent of the voters removed from the voter registration rolls have been purged pursuant to the voter purge law, as reflected by Table One.

## TABLE ONE
### ANNUAL STATISTICS OF THE NUMBER OF VOTERS
### PURGED *v.* RESIDENCY CANVASS

| YEAR: | RESIDENCY CANVASS: | PURGED FOR FAILURE TO VOTE: | TOTAL: |
|---|---|---|---|
| 1985 | 14,532 | 49,526 | 64,058 |
| 1986 | 14,120 | 134,325 | 148,445 |
| 1987 | 13,432 | 172,738 | 186,170 |
| 1988 | 8,857 | 37,785 | 46,642 |
| 1989 | 13,472 | 56,415 | 69,887 |
| 1990 | 22,288 | 126,592 | 148,880 |
| 1991 | 5,387 | 194,346 | 199,733 |
| TOTAL: | 92,088 | 771,727 | 863,815 |

SOURCE:    ANNUAL REPORTS OF THE CITY COMMISSIONERS TO THE PEOPLE OF PHILADELPHIA: YEARS, 1985–1991

Plaintiffs contend that African–Americans and Latinos represent a significant percentage of the voters purged based upon the operation of the purge statute. As a result of the disproportionate impact on minority voters, plaintiffs contend that the voter purge law violates the Voting Rights Act. In addition to statistical evidence of disproportionate impact on minority voters, plaintiffs also contend that the statute violates § 2 based upon several other factors. First, plaintiffs assert that voting related discrimination is endemic to the political process in Philadelphia. Plaintiffs contend that minorities are subject to numerous forms of voting related discrimination that has been characterized by, *inter alia*, racial appeals in political campaigns and racially polarized voting. Second, plaintiffs contend that minorities in Philadelphia face significant forms of discrimination in areas such as housing and employment. Finally, plaintiffs contend that city officials have generally demonstrated a lack of responsiveness to the concerns of minority constituents.

Defendant acknowledges that minority voters are purged at higher rates than white voters, but contends that this statistical disparity is insufficient to constitute a § 2 violation because plaintiffs have failed to establish that, based upon the totality of the circumstances, minority voters are denied equal opportunity to participate in the political process and elect their preferred candidates. In addition, defendant argues that plaintiffs have likewise failed to establish that the operation of the purge statute *caused* minority voters unequal access to the political process and to elect their preferred candidates. These arguments will be considered in light of the applicable legal standard to evaluate a § 2 challenge.

### III. APPLICABLE LAW

**A. Section 2 of the Voting Rights Act**

Congress enacted the Voting Rights Act of 1965 to prohibit any "voting practice or pro-

cedure" that impeded the participation of African–Americans in the political process. Voting Rights Act Amendments of 1982, S.Rep. No. 417, 97th Cong., 2d Sess. 5, *reprinted in* 1982 U.S.C.C.A.N. 177, 181–182 [hereinafter S.Rep. No. 417]. Section 2 of the Voting Rights Act, as originally enacted, provided that:

> No voting qualification or prerequisite to voting, or standard, or practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

79 Stat. 437.

Since Congress enacted the Voting Rights Act in 1965, the statute has been amended in several respects that are directly implicated in this litigation. In 1975, Congress amended § 2 to specifically include within the scope of the statute language and other ethnic minorities in addition to African–Americans. The statute is now also applicable to American Indians, Asian Americans, Alaskan Natives, and people of Spanish heritage. 42 U.S.C. § 1973b(f)(2).

The next amendment of interest relates to the standard of proof required in voting rights cases. Until 1980, plaintiffs were allowed to establish a § 2 violation by demonstrating, based upon the totality of the circumstances, that the challenged electoral procedure had the result of denying a minority group equal opportunity to participate in the political process and to elect their preferred candidates. *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

Then, in 1980, the Supreme Court ruled that a § 2 violation could not be established absent proof that officials enacted or maintained an electoral procedure with an intent to discriminate against minorities. *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The plurality opinion of the Court, written by Justice Stewart, effectively held that plaintiffs seeking to vindicate rights pursuant to the Fourteenth and Fifteenth Amendments, as well as the Voting Rights Act, were not required to demonstrate that the procedure was enacted with the discriminatory intent to deny minorities equal access to the political process.

In response to the Supreme Court's decision in *Mobile v. Bolden,* Congress amended § 2 to eliminate the intent standard and restore the results standard of proof that prevailed prior to *Bolden.*[3] Section 2 as amended provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2), as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not *equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes

---

**3.** In restoring the results standard, Congress sought to remedy three problems engendered by the intent standard. First, Congress felt that the intent standard simply "asked the wrong question" by probing the racial motivations of lawmakers as opposed to evaluating whether the challenged electoral procedure denied minorities access to the political process. S.Rep. No. 417, p. 206. Second, the intent test was viewed as "unnecessarily divisive because it involved charges of racism on the part of individual officials or an entire community." *Id.* Finally and most important, the intent standard was viewed as an extraordinary burden for plaintiffs to satisfy in many cases, because of the difficulty associated with producing evidence to establish the motivations of the legislature when they enacted the challenged electoral procedure. *Id.*

a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis added).

Based upon the language of the statute, it is clear that the central inquiry to evaluate whether. an electoral practice or procedure violates § 2 is whether, based upon the totality of the circumstances, "the political processes ... are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* The 1982 amendments do not preclude plaintiffs from introducing evidence of discriminatory intent, but now afford plaintiffs the option of demonstrating that the challenged electoral procedure has the effect of denying a protected class equal access to the political process and electing representatives of their choice. · S.Rep. No. 417, p. 206.

In addition to the results standard set forth on the face of the statute, the legislative history accompanying the 1982 amendments enumerates several factors that may be pertinent to evaluate allegations that an electoral procedure violates § 2, including:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or

other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.· whether political campaigns have been characterized by overt or subtle racial appeals; and,

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.[4]

S.Rep. No. 417, p. 206–07.

Additional factors that courts may consider include "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and "whether the policy underlying the state or political subdivision's use of such voting qualifications, prerequisite to voting, standard, practice or procedure is tenuous." *Id.* at 207.

## B. Application of Section 2 to the Voter Purge Law

■ Although there have been relatively few cases challenging episodic practices such as voter purge laws pursuant to § 2, the legislative history accompanying the 1982 amendment of the Voting Rights Act clearly illustrates that Congress intended § 2 to be the major statutory prohibition against *all*

---

4. Note, however, that the Supreme Court in a vote dilution case, *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), identified how the use of objective factors in evaluating a § 2 claim may be limited:

Although the Senate report espouses a flexible, fact-intensive test for § 2 violations, it limits the circumstances under which § 2 violations may be proved in three ways. First, electoral devices, such as at large elections, may not be considered *per se* violative of § 2. Plaintiffs

must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*See e.g., Thornburg*, 478 U.S. at 46, 106 S.Ct. at 2764.

types of voting related discrimination.[5] S.Rep. No. 417, p. 207. The scope of the statute therefore includes all electoral practices that deny minority voters equal opportunity to participate in any phase of the political process and to elect candidates of their choice, even if the challenged practice is episodic rather than involving a permanent structural barrier infringing upon the right to vote. *Id.*

Purging voters for failure to vote is an episodic practice that could plausibly produce a discriminatory result in violation of the § 2. *Id.* at 208. For example, purging voters could produce a discriminatory result if fair procedures were not followed, if the need for a purge were not shown, or if opportunities for re-registration were unduly limited. *Id.* at 208 n. 119; *see also, Toney v. White,* 488 F.2d 310 (5th Cir.1973) (affirmed district court's holding to set aside a primary election where registrar purged black voters but not white voters). Although this list provides several examples of how purging voters could violate § 2, it is reasonable to assume that it is not exhaustive and that it does not establish any prerequisites that plaintiffs alleging violations of § 2 must establish in order to state a cognizable claim pursuant to the Act.

## C. Standard of Proof for a Section 2 Violation involving an Episodic Electoral Practice

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). Ultimately, plaintiffs alleging that a challenged electoral procedure violates § 2 must establish that based upon the totality of the circumstances, the electoral procedure denies minority voters equal opportunity to participate in the political process and to elect their representatives of choice. 42 U.S.C. § 1973. To make this determination, courts must assess the impact of the challenged electoral practice based upon certain objective factors outlined in the legislative history accompanying the 1982 amendment of § 2. However, which factors are most relevant for plaintiffs to successfully prove that a challenged electoral procedure violates § 2 will depend upon the nature of the electoral procedure at issue and the specific facts of the case. S.Rep. No. 417, p. 206.

Defendant urges the Court to adopt the view that *Thornburg v. Gingles* should govern the Court's evaluation of whether the voter purge law violates § 2 of the Voting Rights Act. In accordance with the Supreme Court's analysis in *Thornburg,* defendant further urges that plaintiffs are required to demonstrate that the challenged electoral procedure caused unequal access to the political process and the minority groups' inability to elect their representatives of choice.

---

5. Most challenges to the validity of voter purge provisions have been based upon arguments that purge laws violated a plaintiff's constitutional rights, or arguments that city officials responsible for implementing the purge failed to comply with the procedures required by the statute. In general, voter purge provisions have been able to successfully withstand constitutional scrutiny, with most state and federal courts ruling that the statutes do not violate principles of equal protection, free speech or the right to vote. *See Duprey v. Anderson,* 184 Colo. 70, 518 P.2d 807 (1974) (Colorado voter purge statute held constitutional under the Colorado state constitution and the United States Constitution); *Brier v. Luger,* 351 F.Supp. 313 (M.D.Pa.1972) (plaintiffs failed to produce sufficient evidence that operation of the purge violated plaintiffs' constitutional rights); *Williams v. Osser,* 326 F.Supp. 1139 (E.D.Pa.

1971) (preliminary injunction to restore list of voters stricken pursuant to Pennsylvania voter purge law denied); *Williams v. Osser,* 350 F.Supp. 646 (E.D.Pa.1972) (Pennsylvania purge provision constitutional); *Hoffman v. Maryland,* 928 F.2d 646 (4th Cir.1991) (Maryland purge statute did not violate constitutional right to vote, equal protection, or free speech); *but see, Michigan State UAW v. Austin,* 387 Mich. 506, 198 N.W.2d 385 (1972) (Michigan voter purge statute unconstitutional based upon the state constitution).

For an extensive review of cases where purges have violated the terms of a controlling state or local statute, *see generally, The Purging of Empowerment: Voter Purge Laws and the Voting Rights Act,* 23 Harv.C.R.–C.L.L.Rev. 483, 514–17 (1988).

*Thornburg* is the first Supreme Court case to interpret the 1982 amendments to the Voting Rights Act. In *Thornburg*, the Supreme Court addressed a challenge that a multi-member district scheme unlawfully diluted the voting strength of African–American constituents in North Carolina. The district court held that the use of a multi-member district impermissibly diluted the voting strength of African–American voters in violation of § 2. The state appealed this judgment to the Supreme Court.

After a thorough review of the legislative history of the 1982 amendments, the Supreme Court stated that plaintiffs alleging a vote dilution claim involving the use of multi-member districts must satisfy a tri-partite threshold test requiring the minority group to demonstrate three essential elements. First, the minority group must demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district. *Thornburg*, 478 U.S. at 50, 106 S.Ct. at 2766. The Court stated that "[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by the structure or practice." *Id.* at 50 n. 17, 106 S.Ct. at 2766 n. 17. Second, the minority group must establish that it is politically cohesive because "if the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interest." *Id.* at 51, 106 S.Ct. at 2766. Third, the minority group must establish the existence of white bloc voting. *Id.* at 50–51, 106 S.Ct. at 2766. White bloc voting is a necessary element of a vote dilution claim because the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to usually defeat the minorities' preferred candidate. *Id.* If plaintiffs alleging vote dilution claims can satisfy this tri-partite test, they must then establish, based upon the totality of the circumstances,

that they do not have an equal opportunity to participate in the political process and to elect their preferred representatives. *Id.*

Since I am not persuaded that the analysis outlined in *Thornburg* governs the voting rights issue presently under consideration, I decline to rule as a matter of law, that the *Thornburg* tri-partite test is a prerequisite to establishing that the operation of the voter purge law denies minority voters equal opportunity to participate in the political process and to elect their representatives of choice. Defendant recognizes that the claim considered by the Supreme Court in *Thornburg* is distinguishable from the claim presently before the Court: *Thornburg* involved a vote dilution claim challenging the use of multi-member districts, whereas plaintiffs' claim alleges that the voter purge law precludes otherwise eligible minority voters from exercising their right to vote and participate in the political process. Naturally, in the context of a vote dilution claim, plaintiffs should be required, as a threshold matter, to demonstrate the *Thornburg* standard because those factors directly address the ultimate issue in the case: namely, whether the use of a multi-member district denies minority voters equal access to the political process and the ability to elect their representatives of choice.[6]

It is simply not clear that the *Thornburg* pre-conditions are relevant to the plaintiffs' challenge that the voter purge law violates § 2. This conclusion does not reflect the view that *Thornburg* is *only* applicable to vote dilution claims: it merely reflects my view that the *Thornburg* factors, while probative in the context of vote dilution cases, are peripheral issues bearing limited relevance to the plaintiffs' claim presently before the Court. *See Roberts v. Wamser*, 679 F.Supp. 1513, 1530 (E.D.Mo.1987) ("[w]ithout deciding whether or not such requirements are prerequisites to ... the challenge pre-

---

6. The Supreme Court later extended the *Thornburg* standard to include challenges involving judicial elections based upon multi-member district schemes, *Chisom v. Roemer*, — U.S. —, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); vote fragmentation claims involving single member districts, *Growe v. Emison*, — U.S. —, 113

S.Ct. 1075, 122 L.Ed.2d 388 (1993); and influence dilution claims involving a state apportionment scheme, *Voinovich v. Quilter*, — U.S. —, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (assumed for the purposes of analysis that an influence dilution claim was a cognizable claim pursuant to § 2).

**524**

sented here ... the Court will consider the [*Thornburg*] elements with respect to this case.") *rev'd on other grounds,* 883 F.2d 617 (8th Cir.1989); *Hall v. Holder,* 955 F.2d 1563, 1568 (11th Cir.1992) ("*Gingles* places a "gloss" on the Senate Report factors, limiting the use of the factors by requiring that the three *Gingles* factors be established to prove a vote dilution claim."). These elements, particularly whether the minority group is sufficiently large and geographically compact to constitute a majority in a single member district, and whether the minority group is politically cohesive, are generally "supportive of but not essential to" plaintiffs' allegations that the voter purge law violates § 2. *Thornburg,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15.

■ Moreover, the Court is guided by the legislative history sanctioning the importance of applying a flexible approach when evaluating § 2 challenges, rather than a "mechanical" point counting analysis. S.Rep. No. 417, p. 207 n. 117. In effectuating the intent of Congress, the Court will engage in a "searching and practical evaluation" of the political process to determine if the operation of the purge statute violates § 2 of the Voting Rights Act. *Id.* at 208. Engaging in such an analysis requires the Court to recognize that "if a challenged practice relates to a series of events or episodes, [such as the voter purge law], *the proof sufficient to establish a violation would not necessarily involve the same factors* as courts have utilized when dealing with permanent structural barriers." S.Rep. No. 417, p. 207 (emphasis added); *Mississippi State Chapter Operation PUSH v. Allain,* 674 F.Supp. 1245, 1264–65 (N.D.Miss.1987) (racially polarized voting, racial appeals in campaigns, candidate slating process, discriminatory voting requirements such as large election districts and majority vote requirements, were irrelevant to the claim involving the challenged registration procedures); *see also, Thornburg,* 478 U.S. at 48, 106 S.Ct. at 2765 ("some Senate Report factors are more important to multi-member district vote dilution claims than others"). Accordingly, based upon the nature of plaintiffs' § 2 challenge and the specific facts of this case, it would be most appropriate to evaluate the merits of plaintiffs' claim by considering the objective Senate factors outlined in the legislative history of the 1982 amendments without consideration of the *Thornburg* test.

The Court, however, is also free to evaluate other factors or elements that are indicative of whether a challenged electoral procedure violates § 2. S.Rep. No. 417, p. 207 (while the enumerated senate factors will often be pertinent to certain types of § 2 violations other factors may also be relevant and should be considered); *see also, Gomez v. Watsonville,* 863 F.2d 1407, 1413 (9th Cir. 1988) (citing *Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2763) (typical list of factors is neither comprehensive or exhaustive). Hence, I find that plaintiffs must additionally establish that the voter purge law caused minority voters to experience unequal opportunity to participate in the political process and to elect their preferred representatives.

■ Plaintiffs acknowledge that *Thornburg v. Gingles* requires a showing that a multi-member district was responsible for minority voters inability to elect its candidates, but nevertheless contend that causation is only required in § 2 vote dilution cases. Plaintiffs' argument, however, is a distinction without a difference. There is no credible reason to assume that causation is only relevant to claims that an electoral procedure unlawfully dilutes the voting strength of minority voters. In my opinion, implicit in any finding that a challenged electoral procedure violates § 2 is the conclusion that the electoral procedure is the dispositive force depriving minorities of equal access to the political process, and that in the absence of such a procedure, minorities would not be deprived of equal access to the political process and the ability to elect their candidates of choice. Although plaintiffs state that "'causation' cannot logically or legally be deemed necessary for a § 2 challenge to a voter purge law," and defer to the "case law, the legislative history of the Voting Rights Act, and common sense," plaintiffs cite no cases to support their proposition that causation should be limited to cases involving vote dilution claims. *Cf., Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1358 (4th

Cir.1989) ("[a]lthough the district court found a significant disparity ... between the percentage of blacks in the population and the racial composition of the school boards, the court found no proof that the appointive process [the challenged procedure] caused the disparity."); [7] *Wesley v. Collins,* 605 F.Supp. 802, 812 (M.D.Tenn.1985) ("[t]he underlying premise of the results test ... is that a causal connection must be established between the indicia of historically rooted discrimination and the [challenged electoral procedure]").

Plaintiffs erroneously rely on the legislative history accompanying the 1982 amendments to support their contention that causation is not a necessary element of proof for their § 2 challenge. Plaintiffs state that Congress explicitly recognized "that disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation" and "[w]here these conditions are shown, and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any *further causal nexus between their disparate socio-economic status and the depressed level of political participation.*" S.Rep. No. 417, p. 207 n. 114 (emphasis added).

■ The Court agrees that plaintiffs are not required to prove a causal nexus between disparate socio-economic status and political participation rates, since it is clear in most instances that socio-economic factors certainly influence the level of minority participation in the political process. *Roberts,* 679 F.Supp. at 1531 ("[m]inority groups' present socioeconomic disadvantages may reduce that groups participation and influence in political affairs."). In fact, in evaluating a challenge to an election procedure pursuant to § 2, it would be myopic for a court to overlook the impact that such factors may have on minority voter turnout.

■ However, plaintiffs' argument does not negate the Court's conclusion that causa-

tion is a necessary element in establishing that the voter purge law is responsible for African–American and Latino voters' abridgement of the right to vote as defined by § 2. *Collins v. Norfolk,* 605 F.Supp. 377, 404 (E.D.Va.1984) ("... if the socio-economic statistics show a disparity between black and white residents and the level of black political participation is less than that of whites, the plaintiffs need not show a causal nexus *between these two factors.*") (emphasis added). The Court is mindful that the central inquiry applicable to all § 2 challenges is whether, based upon the totality of the circumstances, an electoral procedure operates to deny minority voters equal access to the political process. Although the factors that influence whether plaintiffs have presented sufficient evidence to make this determination may vary based upon the nature of the claim and the specific facts of the case, the fact remains that plaintiffs must demonstrate that the voter purge law, interacted with sociological, historical and economic factors to deny minority voters equal access to the political process. *Thornburg,* 478 U.S. at 47, 106 S.Ct. at 2764 ("[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates.").

The Court further concludes that evidence of causation is necessary even if plaintiffs successfully establish that the purge law disproportionately affects African–American and Latino voters in Philadelphia. Although plaintiffs essentially argue that any significant disparity in the purge rates among white, African–American and Latino voters, "*a fortiori* has the result of denying minority citizens an equal opportunity to participate in the electoral process and elect candidates of their choice," the Court disagrees with this conclusion.

■ A statistical disparity in purge rates, without additional evidence that the purge

---

7. Although the circuit court expressed some reservations about the applicability of § 2 to the challenged election procedure, this factor does not negate the district court's conclusion that the plaintiffs failed to establish causation. The cir-

cuit court affirmed the decision of the lower court's holding that the challenged electoral procedure did not violate the Fourteenth or Fifteenth Amendments, or § 2 of the Voting Rights Act. *Id.*

law *causes* minority voters unequal access to the political process, is insufficient to constitute a § 2 violation based upon the "results" test. Although the Court recognizes that in cases involving discriminatory effect as opposed to discriminatory intent, there is always an emphasis upon demonstrating a statistically significant impact, this emphasis is not a substitute for establishing that based upon the totality of the circumstances, the challenged electoral procedure is responsible for the minority groups' inability to participate in the political process and elect their representatives of choice. *Garza v. County of Los Angeles,* 918 F.2d 763, 770 (9th Cir. 1990).

Having reviewed numerous voting rights cases, I found no cases that rely solely upon the presence of a statistical disparity in concluding that a challenged electoral procedure violates § 2. The cases relied upon by plaintiffs to support their conclusion that a statistical disparity is sufficient to establish a § 2 violation are inapposite in several respects. Plaintiffs rely upon *Gomez v. Watsonville,* 863 F.2d 1407 (9th Cir.1988), in which the ninth circuit reviewed the lower court's decision upholding the challenged electoral procedure. In reversing the lower court's decision, the circuit court clearly found the presence of the *Thornburg* factors in addition to the statistical disparity noted by plaintiffs. *See also, Garza v. County of Los Angeles,* 918 F.2d 763 (9th Cir.1990) (acknowledging a statistical disparity but affirming the district court expressly on the basis of its holding that the county engaged in intentional discrimination); *see also, Toney v. White,* 488 F.2d 310 (5th Cir.1973) (election set aside due to racially discriminatory purge); *Wesley,* 605 F.Supp. at 811 ("proof that [the challenged practice] results in disparate racial impact does not establish a *per se* violation [of § 2] ...").

■■■ Similarly, plaintiffs rely upon *United Parents Assoc. v. Board of Elections,* No. 89–0612, (E.D.N.Y. Mar. 10, 1989) and *N.A.A.C.P. v. Nassau County Bd. of Elections,* No. 90–0306 (E.D.N.Y., Feb. 2, 1990),

to support their proposition that statistical disparity is sufficient to establish a violation. However, the Court does not find these cases dispositive because despite the presence of a statistical disparity, I am unable to ascertain what other factors, if any, influenced the court to find that the voter purge statute at issue in these cases violated § 2. Therefore, the Court concludes that evidence of statistical disparity is not dispositive of whether the challenged electoral procedure deprives minority voters of equal access to the political process and the ability to elect their chosen representatives.

Accordingly, the standard of proof for plaintiffs in this action will be based upon an evaluation of the evidence presented at trial in light of the Senate factors outlined in the legislative history accompanying the 1982 amendments. Furthermore, to prevail on their § 2 claim, plaintiffs must demonstrate that based upon the totality of the circumstances, the challenged electoral procedure interacted with social and historical conditions to deny minority voters equal access to the political process and the ability to elect their preferred candidates.

Having set forth the general factual background of the voter purge law, and the law applicable to the present action, the Court now makes its findings of fact and conclusions of law.

## IV. FINDINGS OF FACT

### A. Impact of the Purge Statute on African–American and Latino Voters in Philadelphia

Plaintiffs contend that the operation of the voter purge law has a disparate impact on African–American and Latino voters, because they are removed from the voter registration rolls at disproportionately higher rates than white voters. Plaintiffs' evidence regarding the impact of the voter purge law on African–American and Latino voters in Philadelphia is based primarily upon a statistical analysis performed by Dr. Allan Lichtman, plaintiffs' expert witness.[8] Dr. Lichtman's

---

8. Dr. Lichtman is a Professor of History at The American University, College of Arts and Sciences in Washington, D.C. He received his B.A.

in History from Brandeis University and his Ph.D. in History from Harvard University. His

analysis focused upon whether there were statistical differentials in the rates that African–American, Latino, and white voters were purged from the voter registration rolls over a four year period from 1989–1992. His analysis does not reveal why people were removed from the voter registration rolls, but reveals only that they were purged. Transcript, I—54–55. Dr. Lichtman concluded that African–American and Latino voters were purged at higher rates that white voters.

Dr. Lichtman's analysis of 1989 and 1990 was based upon ecological regression analysis and extreme case analysis, which he explained were standard methodologies for inferring information about groups based upon race. He explains these methodologies as follows:

> ... The regression methodology generates prediction equations that indicate how the racial composition of each ward relates to the differential rates of purging in each ward. These equations provide information needed to estimate purge rates for different racial groups. Extreme case analysis examines the actual percentage of voters purged in the most heavily white and most heavily black or non-white wards in Philadelphia ... Extreme case analysis provides a check on the results obtained from ecological regression.... [e]xtreme case analysis ... simply tallies the actual

purge rates in the heavily white and heavily minority wards.

Plaintiffs' Ex. No. 35.[9]

In 1989, approximately 4.5% of "African–American + other" registrants were slated for purging, as compared to 4.1% of white registrants. Although the .04 percentage point differential suggests that the purge rate is 9 percent higher for minorities than for whites, Dr. Lichtman's extreme case analysis and ecological regression analysis revealed that in 18 wards where the registered voters were ninety percent or more white, the purge rate was 3.9%, as compared to a 4.0% purge rate in 19 wards where whites comprised ten percent or less of the registered voters.

In 1990, approximately 11.7% of "African–American + other" registrants were slated for purging, compared to 8.5% of the white registrants. These figures suggest that the purge rate for "African–Americans + others" is approximately 38 percent higher for minorities than for whites. Ecological regression and extreme case analysis revealed that in 16 wards where the registered voters were ninety percent or more white, the purge rate was 7.9%, as compared to 11.1% in 18 wards where whites comprised ten percent or less of the registered voters. These results are summarized in Table Two.

### TABLE TWO
### ESTIMATED PURGE RATES FOR WHITES AND
### "AFRICAN–AMERICANS + OTHERS"
#### by year and race

| YEAR: | % SLATED FOR PURGING | | ESTIMATED PURGE RATES | |
|---|---|---|---|---|
| | White | African–American + Other | White | African–American + Other |
| 1989 | 4.1% | 4.5% | 3.9% | 4.0% |
| 1990 | 8.5 | 11.7 | 7.9 | 11.1 |

SOURCE: DECLARATION OF DR. ALLAN LICHTMAN
Plaintiffs' Expert Witness, *Ortiz v. City of Philadelphia*, 1992

---

areas of expertise include, political history, racial bloc voting, and quantitative methods.

9. Dr. Lichtman relied upon these methodologies because registrants who were slated for purging were not identified by race, and Latino surname data was not available in these years.

Dr. Lichtman's analysis of purge rates in 1991 and 1992 was based upon an analysis of city-wide registration rates and an analysis of the voters slated for purging based upon skin color. In these years, the city identified all registrants, including the registrants slated to be purged ("F-coded"), as white, black, or other, based upon self reported data.[10] Latino registrants were identified using Latino surname data.

Plaintiffs assert that the disparate impact of the purge was heightened in 1991 by the defendant's alleged failure to completely purge all voters in accordance with the procedures generally used to implement the voter purge law. In 1991, all voters slated for purging received intent to purge notices; however, the voter records of those registrants to be purged were only removed from the binders of wards 1–40. In wards 41–66, the voter registration division implemented additional procedures to insure that voters precluded from voting pursuant to the purge law were not allowed to vote. The following notice was provided to election board members in wards 41–66 explaining these additional procedures:

YOU ARE DIRECTED TO USE THE FOLLOWING PROCEDURES IN PERMITTING ELECTORS TO VOTE:

(1) Check each voter's name against the Computer Purge List (Failure to Vote List) attached to the discrepancy sheet in the front of the binder.

(2) If the voter's name **DOES NOT APPEAR** on the Computer Purge List, then **FOLLOW NORMAL PROCEDURES.**

(3) If the voter's name **DOES APPEAR** on the Computer Purge List, then you must check the date of registration **(DOR)** and the voter history on the voter's affidavit in the binder.

(4) If the voter's date of registration **(DOR)** is **AFTER APRIL 30, 1989 OR** if the voter has **VOTED IN ANY PRIMARY OR ELECTION** since that date, the voter is **ELIGIBLE AND IS ALLOWED TO VOTE.**

(5) If the voter's name **DOES APPEAR** on the Computer Purge List, **AND** the date of registration **(DOR)** is **BEFORE APRIL 30, 1989 AND** the voter **HAS NOT VOTED** since that date, then the voter is **INELIGIBLE AND SHOULD NOT BE PERMITTED TO VOTE.** These voters have been purged for not having voted in five consecutive elections and should be directed to the Divisional Election Court to seek relief.

In accordance with State Election Laws, the City Commissioners have purged the records of 193,346 individuals who have not voted in the past (five elections) two calendar years.

The affidavits for those purged individuals residing in Wards 41–66 have not been removed.

Judges of Election and other Election Board Members serving at polling site in Wards 41–66 should follow the procedure detailed above, to prevent ineligible purged individuals from voting.

Defendant's Ex. No. 4.

Of the years surveyed by Dr. Lichtman, the 1991 purge rates evidence the most significant statistical differentials among African–American, Latino and white registrants. In general, Dr. Lichtman concluded that 27.0% of Latinos, 25.8% of African–Americans, and 17.3% of white voters were purged. When adjusted for reinstatement, the overall purge rate for "African–Americans + others" is estimated at 20.8% and 13.2% for whites. These results are summarized in Tables Three and Four.

---

**10.** Dr. Lichtman notes that the existence of an "other" category in the registration (which includes non-white & non-black minorities such as Asians and some Latinos, as well as registrants who leave the race question blank) does not substantially affect the analysis of differential purge rates. Plaintiffs' Ex. No. 35, ¶ 12.

## TABLE THREE
## 1991 PURGE RATES
### by race

| | White | African–American | Other | African–American + Other | Latino |
|---|---|---|---|---|---|
| F–Code Rate * | 17.3% | 25.8% | 21.4% | 24.7% | 27.0% |
| Estimated Reinstatement Rates ** | 23.7 | – | – | 15.3 | – |
| Adjusted Purge Rate *** | 13.2 | – | – | 20.8 | – |

\*    F–Code rates were calculated by dividing the number of F-codes in each category city-wide by the number of registrants in each category city-wide.

\*\*    Reinstatement rates were calculated through ecological regression analysis.

\*\*\*    Adjusted rates were calculated by multiplying the F–Code rate by the 23.7% reinstatement rate.

SOURCE: DECLARATION OF DR. ALLAN LICHTMAN, 1992

## TABLE FOUR
## 1991 REGISTRATION AND F–CODE DATA for PHILADELPHIA, PENNSYLVANIA

### by ward and race

#### 1991 Registrants

| | WARDS 1–40 | WARDS 41–66 | WARDS ALL |
|---|---|---|---|
| White | 43.6% | 62.6% | 51.6% |
| Black | 42.8 | 26.9 | 36.1 |
| Other | 13.7 | 10.5 | 12.3 |

#### 1991 F–Codes

| | | | |
|---|---|---|---|
| White | 53.7% | 46.3% | – |
| Black | 68.2 | 31.8 | – |
| Other | 67.1 | 32.9 | – |

#### 1991 Purge Rate for Purge Limited to Wards 1–40

| | Unadjusted Rate | Adjusted Rate * |
|---|---|---|
| White | 9.3% | 7.1% |
| Black | 17.6 | – |
| Other | 14.4 | – |
| Black + Other | 16.8 | 14.1 |

\*    Unadjusted Rates are calculated by dividing the number of F-codes in each category within wards 1–40 by the number of registrants in each category city-wide. Adjusted rates include the reinstatement rate for 1991.

SOURCE: DECLARATION OF DR. ALLAN LICHTMAN, 1992

An analysis of the 1992 purge rates indicates that the overall purge rate was slightly under seven percent. In 1992, 7.4% of African–American voters were slated for purging, compared to 6.4% of the white registrants, suggesting that the purge rate was 16% higher for African–American registrants than white registrants.[11] With respect to Latinos, Dr. Lichtman concluded that the purge rate for Latinos was 7.2% as compared to 6.4% for whites, suggesting that the purge rate is 13% higher for Latinos.

Although there is no evidence establishing that the voter purge law was enacted or maintained with the intent to discriminate against African–Americans, Latinos, or any other racial or ethnic minority group,[12] the Court finds that Dr. Lichtman's analysis clearly reveals that African–American and Latino voters are slated for purging at disproportionately higher rates than their white counterparts, and further, that minorities are purged at higher rates than white registrants.[13] This finding is not limited by the fact that there were fluctuations in the purge rate from year to year: Dr. Lichtman confirmed that these fluctuations did not alter the reliability of his conclusion that the purge law has a substantial and systemic impact on minority voters in Philadelphia.[14] In addition, this finding is not limited by the fact that Dr. Lichtman's analysis of purge rates

for 1989, 1990, and 1992 do not consider the impact that reinstatement may have on the actual purge rate. Based upon reinstatement data calculated for 1991, the Court assumes that reinstatement rates would be minimal and would not alter Dr. Lichtman's ultimate conclusion that African–American and Latino voters are purged at higher rates than white voters.

The Court further concludes that despite the significant statistical disparity evidenced by Dr. Lichtman's analysis of purge rates for 1991, there is no conclusive evidence establishing that the defendant deviated from the established purge procedure with the intent to discriminate against minority voters. In fact, Robert Lee, Acting Director of the Voter Registration Division, testified during the trial that the purge procedure was interrupted in 1991 due to administrative difficulties associated with processing a significant amount of new registrations, the substantial number of people slated to be purged in 1991, and the fact that the voter history updates were not completed until mid-August as a result of processing election results.

However, the Court finds that several factors contributed to the significant statistical disparity found in the 1991 purge rates. First, 1991 represented the highest purge rate of the four years surveyed by Dr. Lichtman: approximately twenty-one percent of all registrants were slated for purging. Registrants purged in this year would have last

**11.** Dr. Lichtman noted that a slight difference in purge rates exists when African–Americans and "others" are combined into a single category. In 1992, 6.6% of African–Americans + "other registrants" were slated for purging compared to 6.4% of the white registrants. The difference of 0.2 percentage points between African–Americans + other and whites means that the purge rate is approximately three percent higher for African–Americans + others than whites. Plaintiffs' Ex. No. 35, ¶ 20.

**12.** The court recognizes that discriminatory intent is not necessary to establish a § 2 violation but nevertheless feels that it is important to indicate the absence of a discriminatory motive.

**13.** Dr. Lichtman offered a general explanation of the results obtained through his analysis of the voter purge law:

> ... [T]he general explanation is ... that you're talking about groups historically that have arrived today at very different socio-economic

positions, that the socio-economic standing of blacks and Hispanics on the one hand as compared to whites on the other hand indicates that—Hispanics and blacks generally, as a group, are much lower on the socio-economic latter [sic] in terms of income, education, and other measures. That has a number of impacts on turnout. It obviously impacts on the individual level in terms of the individual's mustering herself or himself to vote. It also obviously has an impact on this—at the systematic level in terms of resources and experience being available to turn out the vote on election day. So those are the standard reasons why we observe—differential turnouts in this country between whites and minorities. Transcript, I–44.

**14.** Furthermore, it has been documented that non-voting purge laws have had a disparate impact on minority voters. *See The Voting Rights Act: Ten Years Later*, A Report of the United States Commission on *Civil Rights*, p. 84–88 (1975).

voted in the 1988 presidential election year, a year that increasing numbers of minorities registered to vote.

Second, the Court finds that an analysis of the ward population of the city reveals that wards 1–40, the wards where the voter records were removed from the binders, are predominately occupied by minority registrants, as summarized by Table Five.

## TABLE FIVE
### City of Philadelphia Enrolled Members of Political Parties and Registered Voters by Ward and Ethnicity

| YEAR: | WARDS 1–40 | | WARDS 41–66 | |
|---|---|---|---|---|
| | White | Minority * | White | Minority |
| 1985 | 49.40% | 50.60% | 68.24% | 31.76% |
| 1986 | 49.31 | 50.69 | 68.02 | 31.98 |
| 1987 | 47.93 | 52.07 | 66.74 | 33.26 |
| 1988 | 46.29 | 53.71 | 64.98 | 35.02 |
| 1989 | 45.81 | 54.19 | 64.44 | 35.56 |
| 1990 | 44.77 | 55.23 | 64.24 | 35.76 |
| 1991 | 43.10 | 56.90 | 62.20 | 47.80 |

* Minority includes African–American, Latino and other foreign born minorities.

SOURCE: ANNUAL REPORTS OF THE CITY COMMISSIONERS TO THE PEOPLE OF PHILADELPHIA: YEARS 1985, 1986, 1987, 1988, 1989, 1990, 1991

This factor, when considered in conjunction with the fact that there is no conclusive evidence establishing that the procedures implemented in lieu of completing the purge for wards 41–66 in fact precluded disqualified voters from exercising their rights to vote, additionally explains the statistical disparity in the 1991 purge rates of white, African-American, and Latino voters. Although Robert Lee testified that there were no problems associated with implementing the additional procedures in wards 41–66, this testimony, without additional evidence, does not establish that these procedures were routinely followed in these wards, and more important, that ineligible voters were prevented from voting.

**B. Evidence of Historical Official Discrimination in Philadelphia that Affected the Rights of African-Americans and Latinos to Register, Vote or Otherwise Participate in the Democratic Process**

The existence of past discrimination in the areas of registration, voting, and political participation is significant only if it can be shown to have lingering effects on the ability of African-Americans and Latinos to participate in the democratic process today. *Collins v. Norfolk*, 605 F.Supp. at 402 (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1305–06 (5th Cir.1973)). The most probative evidence introduced by plaintiffs to establish a history of official discrimination infringing upon the rights of minorities to participate in the democratic process is the failure of the city to provide ample bilingual voting information.

Plaintiffs contend that defendant has failed to comply with a court order issued in 1974, requiring the city to take affirmative measures to ensure that residents of Spanish heritage were not deprived of the right to vote. The Court takes judicial notice of this case, *Arroyo v. Tucker*, 372 F.Supp. 764 (E.D.Pa.1974), which required the city, *inter alia*, to "provide all written materials which are directly connected with the registration of and election by voters in both Spanish and

English, including but not limited to, sample ballots, voter's certificates, registration certificate and all instructions to voters." *Id.* at 768. At the time of the trial, bilingual registration information was not available throughout the city in the same manner that English only registration materials were made available. Moreover, at the time of the trial, no bilingual intent to purge notices were being used by defendant. Based upon testimony at the trial, there is reason to believe that defendant intends to provide bilingual intent to purge notices. The court strongly urges that this be accomplished. Although these two matters could be construed as violations of at least the spirit of *Arroyo*, this evidence does not establish the existence of historical voting related discrimination infringing upon the rights of Latinos to vote, since it is clear that bilingual registration forms are generally available to individuals or organizations who register bilingual populations.

Plaintiffs also introduced evidence that older voting machines, which tend to experience more mechanical difficulties than newer machines, were typically allocated to wards predominately occupied by minority residents. Commissioner Talmage testified that of the twenty-nine wards that are allocated older voting machines, twenty-one were headed by African–American ward leaders in predominately minority neighborhoods. He further testified, however, that he was unaware of a conscious decision by the City Commissioners to allocate older voting machines to minority wards. Former Mayor Wilson Goode corroborated Commissioner Talmage's testimony to the extent that Mayor Goode contended, based upon his own observations over a ten year period, that voting machine breakdowns frequently occurred in areas that were highly populated by African–American residents. Plaintiffs additionally contend that the defendant's failure to institute voter outreach programs further evidences the defendant's pattern of official discrimination infringing upon the rights of African–Americans and Latinos to vote.

Plaintiffs' evidence regarding voting machine allocations and voter outreach programs is not dispositive of the existence of a history of voting related discrimination. Although there appears to be a correlation between older machines being allocated to neighborhoods with significant minority populations, this factor alone does not establish historical discrimination. Moreover, plaintiffs' suggestion that the city has failed to implement voter outreach programs is refuted by plaintiffs' own evidence. Plaintiffs introduced evidence that Commissioner Talmage, who is African–American, instituted voter outreach programs. The fact that the other commissioners, who are white, did not institute such programs is of no consequence to the Court's conclusion that this evidence does not establish historical discrimination in voting.

## C. Evidence Regarding Racially Polarized Voting in Philadelphia

The Court concludes that plaintiffs have established the existence of racially polarized voting in Philadelphia.[15] Plaintiffs rely upon the testimony of former Mayor Wilson Goode to establish the existence of racially polarized voting in elections in Philadelphia, based

**15.** For example, Charles Bowser, an African–American candidate campaigning for mayor in 1975 and 1979, received approximately five percent of the white vote in each campaign. In the 1983 primary election, Mayor Goode received ninety-eight percent of the African–American vote, compared to approximately twenty-three percent of the white vote. Similarly, Mayor Goode won the general election with approximately ninety-seven percent of the African–American vote and approximately twenty-five percent of the white vote.

Racially polarized voting is further evidenced in the 1987 and 1991 mayoral elections. In the 1987 mayoral primary election, Mayor Goode won the nomination against a white candidate, current Mayor Ed Rendell, with about ninety-six percent of the African–American vote, and approximately ten or eleven percent of the white vote. Conversely, Mr. Rendell received less than five percent of the African–American vote and approximately eighty to ninety percent of the white vote. In the general election against former Mayor Rizzo, Mayor Goode received approximately ninety-eight percent of the African–American vote and approximately eighteen percent of the white vote. In the 1991 Democratic mayoral primary, Mayor Rendell received approximately fifteen percent of the African–American vote; however, the three African–American candidates received five percent of the white vote combined.

upon his analysis of mayoral election returns over a twenty year period. Mayor Goode's testimony revealed that African–American mayoral candidates consistently received minimal support from white voters during the past twenty years.[16]

### D. African–American and Latino Access to the Candidate Slating Process

This factor focuses upon "whether a small group of whites, acting as a formal or informal slating organization, effectively limits the ability of blacks to seek electoral office by excluding black candidates from its slating process." *Collins*, 605 F.Supp. at 404. Plaintiffs presented limited evidence of this factor, relying principally upon the testimony of former Mayor Wilson Goode to establish the existence of discrimination in the candidate slating process. Mayor Goode testified that there was discrimination in the candidate slating process, evidenced by the fact that only two African–Americans have ever been slated for the three key positions in Philadelphia city government. Without questioning the credibility of Mayor Goode's testimony, the Court concludes that plaintiffs have failed to demonstrate the existence of discrimination in the candidate slating process that denies African–American and Latino candidates access to the political process.

### E. The Extent to which African–Americans and Latinos in Philadelphia Bear the Effects of Discrimination in Education, Employment, and Health, which Hinder Their Ability to Participate Effectively in the Political Process

In evaluating this issue, the Court focuses upon whether there are significant socioeconomic disparities among African–Americans, Latinos, and whites that may affect the political participation rates of minority voters in Philadelphia.

### 1. Education

The 1990 Census reflects that the educational attainment of African–American and Latino residents is significantly less than the educational attainment of white residents.[17] For example, the percentage of white residents who graduated from high school is approximately 34.06%, as compared to 32.-81% for African–Americans and 23.36% for Latinos. Alternatively, the percentage of white residents who did not graduate from high school is approximately 31.90%. By way of comparison, the 1990 Census figures show that the percentage of African–Americans who did not graduate from high school is 39.81% and 55.31% of Latinos, which is the highest rate for any racial or ethnic group in the city.

### 2. Housing

Housing statistics from the 1990 Census indicate that white residents are more likely to own homes than African–American or Latino residents. Of the 1,051,976 owner occupied housing units in Philadelphia County, white residents occupy approximately 58%; African–Americans occupy approximately 36%; and Latinos occupy approximately 4%. Of the total number of renter occupied units, white residents occupy 42%; African–Americans occupy 47%; and Latinos occupy approximately 8%.

Additionally, the Court finds that minorities in Philadelphia have experienced discrimination in housing. The Court takes judicial notice of *Shannon v. U.S. Dept. of Housing & Urban Dev.*, 436 F.2d 809 (3d Cir.1970) in which the court reversed a dismissal of a housing discrimination complaint brought by African–American plaintiffs against Philadelphia, and *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978), which held that Philadelphia violated Title VII of the Civil Rights Act and the Fourteenth Amendment to the Unit-

---

**16.** Mayor Goode also testified that there are instances when African–American voters have voted for white candidates, even when an African–American opposed the white candidate, but that white voters tended to vote almost exclusively for white candidates. Transcript, I–159.

**17.** In addition, Councilman Angel Ortiz testified that there have been significant attempts to achieve appropriate bilingual education for Spanish speaking children, but these efforts have not resulted in the implementation of a suitable program.

ed States Constitution by intentionally discriminating against African–Americans by refusing to construct low income housing in predominately white neighborhoods in Philadelphia.

### 3. Health Care

With respect to health care, the Court finds that Latino residents, as a result of their cultural background and socioeconomic status, experience substantial difficulty in Philadelphia acquiring adequate health care.[18] Nationwide, research has revealed that the sociocultural customs of some Latinos result in lower utilization of traditional health services and, consequently, poorer health status. Plaintiffs' Ex. No. 45, p. 6.

During the trial, Kristin Minot, a researcher for the Philadelphia Health Management Corporation (PHMC), summarized the results of a 1987 household health survey conducted by PHMC regarding the health care status of Latinos in Philadelphia. In general, this study indicated that nearly one in four (23.0%) Latinos in Philadelphia rated their health as only fair or poor, which is one and one-half times the citywide average for the general population, and represents approximately 19,300 Latinos in fair or poor health. *Id.* at 10.

This fact may be explained because one in five Latinos in Philadelphia (19.9%) has neither public nor private health insurance, which is more than twice the proportion of uninsured persons in the general population of Philadelphia. *Id.* at 20. In addition, Latinos without health insurance are significantly less likely to have a regular source of care compared with insured Latinos. *Id.* at 11.

Approximately one in six (16.7%) Latinos lacks a regular source of health care, which represents 14,000 Latinos city-wide and is substantially higher than the average for the general city-wide population (11.5%). *Id.* at 11.

The evidence also reveals that a substantial portion of Latinos in Philadelphia report problems obtaining and paying for health care. *Id.* at 18. For example, respondents from approximately 8% of Latino households report that someone in the household failed to obtain needed health care, including prescriptions, during the previous year, as compared to the city-wide average of approximately 6%. *Id.*

Although the results of this survey do not conclude that the city discriminates against Latinos in the provision of health care services, the Court nevertheless finds that this evidence establishes that the health care status of Latino residents in Philadelphia is substantially worse than the general population of the city. *See also, Latinos in Pennsylvania: Summary Report and Recommendations*, Pennsylvania Governor's Advisory Commission on Latino Affairs, p. 11 (Apr. 1991) (finding that most Latinos constitute the "working poor" and that "[Latinos] have limited or no health insurance coverage and no alternative means of financing health care services).

### 4. Employment

With respect to employment, the 1990 Census employment statistics evidence the socio-economic disparity between white, African–American and Latino residents in Philadelphia, as reflected by Table Six.

### TABLE SIX
#### 1990 Census: Employment Status
#### by race

| | Employed | Civilian Force: Unemployed | Rate of Unemployment | Not in Labor Force |
|---|---|---|---|---|
| White | 388,024 | 25,132 | 6.1% | 287,886 |
| African–American | 230,414 | 40,153 | 14.8 | 196,971 |
| Latino | 24,107 | 4,497 | 15.7 | 26,419 |

SOURCE: 1990 CENSUS DATA, PROFILE 14

---

18. Plaintiffs did not introduce any corresponding evidence with respect to African–American residents.

The disparity in employment is further evidenced by several instances in which minority plaintiffs have initiated successful legal proceedings based upon discrimination in employment. The Court takes judicial notice of several cases. In *Alvarez v. Philadelphia,* 98 F.R.D. 286 (E.D.Pa.1983), the court certified a class of Latinos who had not been hired as police officers, claiming discrimination. A consent decree was entered by the court on May 21, 1984, requiring the parties to institute remedial steps in that case and in two consolidated cases concerning Philadelphia Police Department hiring practices: *Ulloa v. Philadelphia,* No. 79–375, and *Lopez v. Philadelphia,* No. 79–1192.

### 5. Income

Economically, the 1990 Census reflects considerable disparities in the average incomes of white, African–American, and Latino residents, as well as significant disparities in the rates that these populations are below the poverty level, as reflected by Table Seven.

### TABLE SEVEN
#### 1990 Census Data: Income and Poverty Status by race

|  | Average Income in 1990 | Percentage below the Poverty Level |
|---|---|---|
| White | $35,467 | 11.1% |
| African–American | 25,544 | 29.0% |
| Latino | 20,528 | 45.3 |

SOURCE: 1990 CENSUS DATA, PROFILES 17–19

### 6. Conclusion

Having considered the evidence presented on these issues, the Court concludes that there are substantial socioeconomic disparities among African–American, Latino and white residents of the city of Philadelphia, which affect the ability of these minority groups to participate in the political process and to elect their candidates of choice. *See* Sen.Rep. No. 417, p. 207 (where disproportionate educational, employment, income level, and living conditions arising from past discrimination are shown and the level of minority political participation is depressed, plaintiffs need not prove any further causal nexus between disparate socio-economic status and the depressed level of political participation); *Magnolia Bar Assn. v. Lee,* 793 F.Supp. 1386 (S.D.Miss.1992) (finding that "blacks in Mississippi continue to bear the effects of discrimination in ... socioeconomic attainment which continues in some ways to affect their opportunity to participate in the political process and to elect representatives of their choice."). This conclusion is further supported by statistical evidence demonstrating that minority voters in Philadelphia do not exercise their right to vote to the same extent as white voters, which in part may be attributable to discrimination and the overall socioeconomic status of minorities in Philadelphia. *See* Table Eight.

## TABLE EIGHT
## VOTER REGISTRATION AND VOTER TURNOUT STATISTICS FOR GENERAL ELECTIONS
### by Year and Ethnicity

| | ELIGIBLE VOTERS: | | | ACTUAL VOTERS: | | | PERCENTAGE: | | |
|---|---|---|---|---|---|---|---|---|---|
| | White | Black | Other | White | Black | Other | White | Black | Other |
| **YEAR:** | | | | | | | | | |
| 1987 | 529,863 | 370,768 | 56,143 | 369,763 | 249,141 | 27,888 | 69.7 | 67.2 | 48.6 |
| 1988 | 540,397 | 384,712 | 74,897 | 390,965 | 238,752 | 40,424 | 72.5 | 62.1 | 54.2 |
| 1989 | 515,984 | 369,733 | 77,751 | 233,606 | 112,730 | 10,267 | 45.3 | 30.5 | 20.8 |
| 1990 | 464,350 | 321,417 | 88,653 | 252,221 | 120,349 | 27,079 | 54.3 | 37.4 | 30.5 |
| 1991 | 408,143 | 267,172 | 120,642 | 274,652 | 155,987 | 53,936 | 67.2 | 58.3 | 44.7 |

SOURCE: ANNUAL REPORTS OF THE CITY COMMISSIONERS TO THE PEOPLE OF PHILADELPHIA: YEARS 1987, 1988, 1989, 1990, 1991

---

### F. Whether Political Campaigns have been Characterized by Racial Appeals

In considering this factor, courts have generally looked for a "general pattern of racial appeals in political campaigns." *Collins,* 605 F.Supp. at 404. Plaintiffs introduced anecdotal evidence to establish that elections in Philadelphia have been characterized by overt and covert racial appeals. This evidence is based upon the testimony of former Mayor Wilson Goode, and Dr. Marjorie Dugan, the Executive Director of the Fellowship Commission in Philadelphia, a nonprofit, nonpartisan organization, responsible for, *inter alia,* creating the Fair Election Campaign Practices Code. The Court concludes that the evidence presented by plaintiffs is suffi-cient to establish a "general pattern" of racial appeals in some campaigns in Philadelphia.

Mayor Goode's testimony was based upon his observations of elections in Philadelphia since 1971. In general, he testified that there was, and continues to be, racial appeals in political campaigns in Philadelphia, which have been manifested in such forms as: (1) associating African–American candidates with prominent but controversial African–Americans such as Jesse Jackson and Louis Farrakhan in an effort to appeal to the white vote;[19] (2) altering pictures and commercial advertisements based upon race;[20] attacking

---

19. In the 1983 mayoral election, Mayor Goode testified that his opponent, former Mayor Frank Rizzo, attempted to associate Mayor Goode with Jesse Jackson and Harold Washington, implying that Mayor Goode's candidacy was part of "a movement by blacks to take over all across the country." In addition, Mayor Goode testified that in the 1987 mayoral primary election, Ed Rendell, Goode's opponent, attempted to associate Mayor Goode with Louis Farrakhan, a controversial Muslim leader. Transcript, I–117–18, I–124.

20. Dr. Dugan testified that about two years ago, Allison Schwartz and Joe Rocks were both running for State Senator. Mr. Rock's campaign literature sought to link Ms. Schwartz to Mayor Goode's administration in a brochure with both their pictures, and darkened the picture of Ms. Schwartz to make her appear dark-skinned, although she was white. Transcript, II–11.

In addition, Mayor Goode testified that in the 1985 district attorney's election, campaign televi-

candidates who support minority issues;[21] and omitting minority candidates from campaign literature.[22]

In addition, Dr. Dugan testified that racial appeals in campaigns, or the use of race to influence elections, is prevalent in Philadelphia. Elaborating upon this conclusion, she further testified that the Commission has received approximately thirty to thirty-five complaints over the past several years regarding racial appeals in campaigns, and that approximately sixty-five percent of the complaints were well founded. In general, the complaints concerned campaign tactics employed by whites who are believed to be using race or ethnicity as a factor in the election.

## G. The Extent to Which African–Americans and Latinos Have Been Elected to Public Office in Philadelphia

Although Plaintiffs recognize that there is no constitutional or statutory right to proportional representation, plaintiffs nevertheless contend that minority candidates have experienced considerable difficulty being elected to public office in Philadelphia. Plaintiffs introduced the testimony of Wilson Goode, who during the past thirty years, was the only minority candidate to become Mayor of Philadelphia.[23] In addition, although the city council is currently represented by seven minority members, plaintiffs contend that the minority candidates elected in district wide elections represent minority districts.[24]

### TABLE NINE
### REPRESENTATIVES FROM PHILADELPHIA IN THE STATE HOUSE AND SENATE
by percentage of minorities represented

| YEAR: | Total: | House Minority: | Percentage: | Total: | Senate Minority: | Percentage: |
|---|---|---|---|---|---|---|
| 1979 | 34 | 10 | 29% | 8 | 3 | 32% |
| 1980 | 34 | 11 | 32 | – | – | – |
| 1982 | 29 | 12 | 41 | 7 | 7 | 42 |
| 1985 | 29 | 13 | 44 | 7 | 3 | 42 |
| 1986 | 29 | 13 | 44 | – | – | – |
| 1988 | 29 | 13 | 44 | – | – | – |
| 1990 | 29 | 13 | 44 | – | – | – |
| 1992 | 27 | 13 | 44 | 7 | 3 | 42 |

SOURCE: *Ortiz v. City of Philadelphia,* Defendant's Ex. 15

sion advertisements sought to portray the African–American candidate, who was fairly light skinned, as much darker than he was to ensure that viewers knew that the candidate was in fact African–American. Transcript, I–121.

21. Dr. Dugan testified that a candidate, who was not a minority candidate, was attacked by campaign opponents for supporting Latino issues. Transcript, II–40.

22. Councilman Ortiz testified that in one year, campaign literature was distributed by the Democratic party listing all city council candidates running at large, except for Augusta Clark, an African–American woman, and Councilman Ortiz, a Latino. Transcript II–157.

23. Mayor Goode testified that he was the only African–American candidate to successfully run for mayor of the city, despite the fact that twelve African–Americans have run for the office during the past thirty years. Similarly, Councilman Ortiz testified that since 1980, there have been four Latino elected officials in public office: Nelson Dias who is a Judge of the Court of Common Pleas appointed by Governor Thornburg in 1981; Angel Ortiz, city councilman; Ralph Costa, elected as State Representative from a Latino majority single member district; and Nitza Quinones Alejandro, Court of Common Pleas Judge, elected in 1991.

24. Two of the minority councilmembers were elected at large, and the remaining five were elected in district wide elections.

The Court concludes that plaintiffs have failed to demonstrate that minority candidates experience difficulty in electing representatives to office. Although there has been one minority mayor over the past several years, the city council has been consistently represented by a strong minority presence, despite the fact that some of the councilmembers represent wards that are highly populated by minority constituents. Moreover, the statistics regarding the composition of the Pennsylvania legislature reveal that Philadelphia has consistently chosen minority candidates to be their state representatives and senators, as reflected by Table Nine.

## H. Responsiveness of Elected Officials to the Particularized Needs of African–Americans and Latinos

■■■ The Fourth Circuit has summarized the concept of unresponsiveness as follows:

a degree of unresponsiveness to the needs and interests of the ... minority so palpable that it compels—or even fairly supports—an inference that the minority's "voting potential" has been so effectively "canceled out" that its residual "political strength" is presently being disregarded with confident impunity by the city's governing body.

*Collins,* 605 F.Supp. at 405 (citing *Washington v. Finlay,* 664 F.2d 913, 923 (4th Cir. 1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982)).

Councilman Angel Ortiz testified that although the city has attempted to be more responsive to the needs of the Latino community in Philadelphia, the city has nevertheless inadequately responded to the "particularized" needs of the Latino communities. Examples cited by Councilman Ortiz include that the city has failed to provide community development funding, as well as generally focusing upon the other relevant socio-economic issues concerning low income populations. Transcript, II–147.

Corroborating Councilman Ortiz's testimony, Mayor Goode testified that during his tenure as Mayor, there was an inequitable distribution of city services evidenced by constituents from certain areas of the city circumventing the normal channels for receiving city services. Mayor Goode indicated that he assumed that there were similar problems in the administration today, because he continues to receive on a daily basis, approximately ten telephone calls per day from African–American residents indicating that they are unable to get assistance from various city departments.

In addition, both Councilman Ortiz and Mayor Goode testified that African–American and Latino residents are discriminated against by certain city departments, most notably the police department. Mayor Goode testified that African–Americans are abused "more regularly than white citizens," which he attributed in part to the fact that the police force is approximately 75% white, despite that fact that African–Americans represent approximately 40% of the city's population. In addition, the Court takes judicial notice of *Spring Garden United Neighbors, Inc. v. Philadelphia,* 614 F.Supp. 1350 (E.D.Pa.1985), which awarded damages to Latino residents who were unlawfully arrested during the city's anti-drug effort.

The Court finds that this evidence establishes that in certain respects, the particularized needs of minority citizens have not always been adequately addressed by city officials, and further, that this factor, as well as the impact of various socioeconomic factors, could influence minority participation in the political process.

## I. Tenuousness of State Policies Underlying the Purge Law

Plaintiffs assert that the proffered policy reasons for the voter purge law are tenuous,

and do not support the conclusion that the purge law is necessary to effectuate a sound electoral process. However, the Court concludes that plaintiffs have failed to demonstrate that the voter purge law is the product of tenuous policy considerations. In addition to the City's clear objective to effectively police fraudulent registrations and maintain current voter registration information, additional reasons proffered by the City to justify the purge provision include: (1) reducing the chances of errors in the administration of the electoral process; (2) enhancing the public's confidence that the electoral process is not subject to fraud, error or abuse; (3) facilitating prompt and accurate notice to party organizations and candidates of facts concerning the electorate; (4) enabling city commissioners and county board of electors to determine the number of election workers to be employed; and (5) cost effectiveness.

The policy reasons underlying the city's implementation of the voter purge law are substantive and are based upon a valid state interest of ensuring that elections are Philadelphia are not plagued with fraud. Plaintiffs have failed to establish that the policy reasons offered for the purge law are tenuous.

## V. CONCLUSIONS OF LAW

■ Based upon the "totality of the circumstances" and the "results" test mandated by amended § 2 of the Voting Rights Act, 42 U.S.C. § 1973, the Court finds that plaintiffs did not sustain their burden to establish that the voter purge law is a *per se* violation of § 2 of the Voting Rights Act. Plaintiffs have failed to demonstrate that the purge law

interacts with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives, particularly since it is undisputed that the purge procedure is administered fairly and that there is ample opportunity for purged voters to re-register to vote. Although it is clear that the operation of the purge law removes African–American and Latino voters from the voter registration rolls at higher rates than white voters, this disproportionate impact does not rise to the level of a *per se* violation of § 2, even when considered in light of the court's findings of the existence of racially polarized voting, socioeconomic disparities in education, employment and health, racial appeals in some elections, and the failure of the City in some instances to address the needs of minority citizens. While it is clear that these factors may contribute to decreased minority political participation rates, plaintiffs' evidence simply does not justify the conclusion that the purge law is the dispositive force depriving minority voters of equal access to the political process in violation of § 2.[25]

■ Not every incidental burden on the right to vote violates § 2. Voters in jeopardy of being purged who are interested in preserving their right to participate in the political process need only vote or request reinstatement to preserve that right. In the event that a person is purged, the voter is merely required to re-register to vote, which is a necessary evil to insure that the city maintains accurate voter registration information.

Accordingly, defendant is granted judgment as a matter of law, and plaintiffs' request for a permanent injunction to preclude the defendant from purging voters for failure to vote is denied.

25. I am aware that President Clinton recently signed the National Voter Registration Act of 1993, which will apparently preclude states from purging voters for failure to vote in Federal elections. Since this statute is not effective until January, 1995, any considerations regarding the impact of this enactment upon the outcome of this case is beyond the scope of the issues presently before the Court. My holding in this case is simply that the existing Pennsylvania voter purge law does not violate the Voting Rights Act of 1965.

540

## APPENDIX A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Civil Action No. 91–6123

Honorable C. Delores Tucker, et al.

v.

City of Philadelphia Office of City Commissioners Voter Registration Division, et al.

Civil Action No. 91–6681

Angel Ortiz, a member of the Philadelphia City Council, in his individual capacity, Project Vote!, and Service Employees International Union

v.

City of Philadelphia Office of the City Commissioners Voter Registration Division, and Martha Johnson in her official capacity as Administrator of the City of Philadelphia

### MEMORANDUM AND ORDER

October 29, 1991.

BUCKWALTER, District Judge.

This matter comes before the court on plaintiff Tucker's application for preliminary injunctive relief dated October 8, 1991, and plaintiff Ortiz's application petition for injunctive relief dated October 28, 1991. On the latter date, a hearing was held at which time the plaintiffs presented the affidavit of Angel Ortiz and David Russo, together with the declarations of Sanford A. Newman, Walter P. McGill, Jr., Richard Nye, Timothy J. O'Brien and Eric B. Schnurer. The court also attempted to have the parties stipulate as to certain facts. That stipulation consisted of the following:

1. On March 5, 1991, 255,964 persons were mailed a notice of intent to cancel their registration if he or she did not vote in the next primary or election, or file with the commission a request for reinstatement ten days prior to the next primary or election. A copy of the particular notice sent to these persons was also admitted as an exhibit at the hearing.

2. A computer list of those previously notified who had not voted, registered or requested reinstatement was generated and as a result of that, 193,346 names were purged from the voter registration list, street lists and voter certificates.

3. 86,370 of those purged were blacks; 82,523 of those purged were white; and 24,-453 were "others".

Aside from the above stipulations and the affidavits and declarations which the court accepted for purposes of the hearing, neither side requested any testimony and the balance of the hearing consisted of argument by the plaintiffs, the defendant and a representative from the Office of the Attorney General of the Commonwealth of Pennsylvania.[26]

While not stipulated as a fact, it was alleged by the plaintiff that the 86,370 black voters purged represent a total of 25.8 percent of the 334,187 black voters. In the "other" category, the 24,453 voters purged represented 21.4 percent of the 114,209 "other" voters. Finally, the 82,523 white voters purged represented 17.2 percent of the 477,-627 white voters.

Based on the foregoing, the plaintiffs request injunctive relief from the operation of Pennsylvania's two-year purge statute which provides as follows:

During each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the commission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two im-

---

26. On October 29, 1991, plaintiffs submitted the affidavit of McInasielski and defendants submit- ted the affidavit of Robert Lee.

mediately preceding calendar years, and that his registration will be canceled if he does not vote in the next primary or election or unless he shall, within ten days of the next primary or election, file with the commission, a written request for reinstatement of his registration, signed by him, setting forth his place of residence. A list of the persons to whom such notices shall have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members. At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be canceled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The official registration application card of an elector who has registered may qualify as a reinstatement of his registration or a removal notice. The cancellation of the registration of any such elector for failure to vote during the two immediately preceding calendar years shall not affect the right of any such elector to subsequently register in the manner provided by this act.

Whenever the registration of an elector has been canceled through error, such elector may petition the commission for the reinstatement of his registration not later than the tenth day preceding any primary or election, and after a hearing on said application, if error on the part of the commission is proved, the commission shall reinstate the registration of such elector. As amended 1976, July 1, P.L. 476, No. 122, § 22, effective in 30 days. See 25 P.S. § 623–40.

There has been no evidence that the defendants have failed in any respect to comply with the provisions of the above quoted statute. Instead, the plaintiffs argue, this statute violates the Voting Rights Act of 1965, (42 U.S.C. §§ 1971 and 1973) as well as the First and Fourteenth Amendments.

This court has already written an opinion denying substantially similar claims with regard to the constitutional issues involving the Fourteenth Amendment. *Williams v. Osser,* 326 F.Supp. 1139 (1971). The opinion in the aforesaid case did not address the Voting Rights Act. Counsel for plaintiffs have candidly admitted that they could find no published federal court decisions ruling on the issue whether a voting purge law such as the one in question violates the Voting Rights Act.

The First Amendment issue is discussed in *Hoffman v. State of Maryland,* 928 F.2d 646 (4th Cir.1991). The court concluded in a case involving a voter purge statute similar to Pennsylvania's that such a statute does not violate the First Amendment. I agree with that conclusion.

As counsel for plaintiffs conceded, there are no cases which discuss whether voter purge statutes violate the Voting Rights Act.

In *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the court stated:

> The preamble to the Voting Rights Act of 1965 establishes that the central purpose of the Act is "[t]o enforce the fifteenth amendment to the Constitution of the United States." The Fifteenth Amendment provides:
>
> > "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., Amdt. 15, § 1.

In 1982, Congress amended § 2 of the Voting Rights Act to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.

Section 2 of the Voting Rights Act of 1965 as amended, now reads:

"Sec. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees

set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 96 Stat. 134.

Based on the scanty record I have before me in this case, I cannot conclude that the Voting Rights Act has been violated.

As is known by counsel for all parties, a preliminary injunction is an extraordinary remedy and should be imposed only in the clearest of cases. I do not find this to be such a clear case as would warrant the far reaching remedy that plaintiffs have requested. In other words, the plaintiffs have not sustained their burden of proving their likelihood of success on the merits.

Accordingly, the following order is entered:

### ORDER

AND NOW, this 29th day of October, 1991, the petition for preliminary injunction requested by plaintiffs in the above consolidated action is DENIED.