OPINION OF THE COURT
GARTH, Circuit Judge:
Plaintiffs Angel Ortiz, Project Vote!, and Service Employees International Union (collectively “Ortiz”) brought suit in the U.S. District Court for the Eastern District of Pennsylvania seeking to enjoin the City of Philadelphia (“City”) from implementing Pennsylvania’s non-voting purge law as viola-tive of the Voting Rights Act of 1965. The district court denied Ortiz’s request for a permanent injunction and Ortiz appealed. We have jurisdiction over Ortiz’s appeal pursuant to 28 U.S.C. § 1291. Finding no merit to Ortiz’s legal arguments, we will affirm.
I
Pennsylvania law provides that registered voters who fail to vote for two years shall be purged from the registration rolls after being provided notice of the same. 25 Pa.Stat. § 623-40.[1] In the summer of 1991, approximately 21 percent of Philadelphia’s registered voters (193,000 voters) were slated to be purged from Philadelphia’s registration rolls for failing to vote.
On October 25, 1991, Ortiz filed an action alleging that the non-voting purge act had a disparate impact on minority voters and, thus, violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, the First and *308 Fourteenth Amendments of the United States Constitution, and the Pennsylvania Election Law, 25 Pa.Stat. 623-40. Ortiz sought a judicial declaration that the purge violated the aforementioned provisions, as well as an injunction directing the City to restore all purged voters to the City’s voter registration rolls, and enjoining the City from any further purging of non-voting, registered voters.
On October 29, 1991, the district court denied Ortiz’s motion for a preliminary injunction. No appeal was taken. One month prior to the November 1992 elections, Ortiz again sought a temporary restraining order or preliminary injunction and an immediate hearing on the merits. This request was denied by order of the district court on October 6, 1992. Ortiz filed a petition for writ of mandamus (92-1821) and notices of appeal (92-1822 and 92-1839) from the district court’s order, as well as a motion for injunction pending appeal, a motion for expedited appeal, and a motion for permanent injunction. We denied Ortiz’s motions and petition for writ of mandamus on October 8 and 14, 1992. Ortiz’s appeals were dismissed for failure to prosecute.
On November 10, 1992, a four-day trial was held to determine whether a permanent injunction should issue. On June 1,1993, the district court granted judgment in favor of the City, denying Ortiz’s requested relief. Ortiz v. City of Philadelphia, 824 F.Supp. 514 (E.D.Pa.1993). After making extensive findings of fact, and recognizing that African-American and Latino voters are purged at disproportionately higher rates than their white counterparts, id. at 526-31,[2] the district court held that the purge law did not deprive minority voters of equal access to the political process in violation of Section 2. Id. at 539.
Ortiz appeals the denial of his Section 2 claim.[3]
II
Ortiz argues that the district court failed to apply the correct standard in concluding that he had failed to demonstrate that the purge statute violated Section 2 of the Voting Rights Act. In particular, Ortiz asserts that the district court erred in finding that he had failed to prove that the purge statute caused minority voters to be removed from the voter-registration rolls at disparate rates.
A.
A district court’s conclusion that a challenged electoral practice has a discriminatory effect is a question of fact subject to review for clear error, Thornburg v. Gingles, 478 U.S. 30, 79, 106 S.Ct. 2752, 2781, 92 L.Ed.2d 25 (1986) (recognizing that determination of whether or not political process is equally open to minority voters “is peculiarly dependent upon the facts of each case and *309 requires an ‘intensely local appraisal of the design and impact’ of the contested electoral mechanisms”). The question of which standard (i.e., which individual factors) a district court should apply in determining whether, under the totality of the circumstances, a challenged electoral practice has a discriminatory effect, however, presents a question of law subject to plenary review. Id. Accord Jenkins v. Red Clay Consolidated School District Board of Education, 4 F.3d 1103, 116-17 (3d Cir.1993).
B.
The Voting Rights Act of 1965 was enacted to enforce the Fifteenth Amendment of the United States Constitution, which provides: “The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.”
In 1982, Congress amended Section 2 of the Voting Rights Act “to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.” Chisom v. Roemer, 501 U.S. 380, 383-84, 111 S.Ct. 2354, 2358, 115 L.Ed.2d 348 (1991) (holding that state judicial elections are included within the scope of Section 2 of the Voting Rights Act). That is, “Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone.” Id. at 404, 111 S.Ct. at 2368.
As amended, Section 2 of the Voting Rights Act provided as follows:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
(Emphasis added).
In Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), a case which did not involve a purge act, black citizens of North Carolina brought suit challenging that state’s legislative redistricting plan on the grounds that the plan impaired black citizens’ ability to elect representatives of their choice in violation of Section 2 of the Voting Rights Act. The district court, applying the “totality of the circumstances” test set forth in § 2(b) of the Voting Rights Act, held that the redistricting plan violated the Act because it resulted in the dilution of black citizens’ votes in all of the disputed election districts.
The Supreme Court affirmed the decision of the district court with respect to all of the disputed districts except one. In so ruling, the Court held that to determine “whether ‘as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice,’ ” a court must “assess the impact of the contested structure or practice on minority electoral opportunities ‘on the basis of objective factors.’ ” Thornburg, 478 U.S. at 44, 106 S.Ct. at 2763.
The Senate Judiciary Committee Report that accompanied the bill amending Section 2 enumerated a non-exclusive list of factors relevant to a Section 2 claim: the history of official voting-related discrimination in the *310 State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used electoral practices that tend to enhance the opportunity for discrimination; whether minorities have been excluded from any candidate slating process; the extent to which minority groups bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; the extent to which political campaigns have been characterized by overt or subtle racial appeals; the extent to which minority members have been elected to public office; whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of minority groups; whether the policy underlying the use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. S.Rep. No. 97-417, 97th Cong., 2d Sess. 28-80, reprinted in 1982 U.S.C.C.A.N. 177 (“S.Rep.”).
Although in Thornburg v. Gingles the Supreme Court proceeded to weigh these factors, the Court also recognized that the Senate Judiciary Committee list was, in fact, “neither comprehensive nor exclusive,” 478 U.S. at 45, 106 S.Ct. at 2763, and that “there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another.” Id., quoting S.Rep. at 29. 1982 U.S.C.C.A.N. p. 207. That is, both the Court and the Committee recognized that other factors might be relevant to the determination of whether, under the totality of the circumstances, a given electoral procedure was discriminatory.
On this much, the parties agree. Ortiz argues, despite the allegations in his complaint, that the district court completely negated the totality of the circumstances test set out by Section 2 in holding that if the purge statute was not “the dispositive force depriving minorities of equal access to the political process” then, under the “totality of the circumstances,” there was no violation of the Voting Rights Act.[4]
The City argues that the district court did not err in requiring Ortiz to show that the purge statute caused minority voters to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
C.
The primary legal issue before us, then, is whether the district court erred by factoring into its “totality of the circumstances” analysis the question of whether or not the purge statute caused minorities to be deprived of equal access to the political system.
1.
The Supreme Court wrote in Thornburg v. Gingles that “[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” 478 U.S. at 47, 106 S.Ct. at 2764 (emphasis added). That is, the Supreme Court recognized that there must be some causal connection between the challenged electoral practice and the alleged discrimination, that results in a denial or abridgement of the right to vote.
Three Courts of Appeal have required Section 2 plaintiffs to demonstrate a causal connection between asserted indicia of discrimination and the challenged electoral procedure at issue. In Wesley v. Collins, 791 F.2d 1255 (6th Cir.1986), the plaintiffs argued that a Tennessee law which disenfranchised convicted felons had a disproportionate impact on blacks because a significantly higher number of black Tennesseeans are convicted of felonies than whites. The Court of Appeals rejected this argument, despite the district court’s findings that there existed in Tennessee “a history of racial discrimination, the effects of which continue to the present day.” *311 Id. at 1261. The court held that, under the totality of the circumstances, the presence of some of the factors enumerated in the legislative history of Section 2 was outweighed by other factors such as the state’s legitimate and compelling rationale for enacting the statute at issue. The court concluded that “the disproportionate impact suffered by black Tennesseeans does not ‘result’ from the state’s qualification of the right to vote on account of race or color and thus the Tennessee Act does not violate the Voting Rights Act.” Id. at 1262.
In Irby v. Virginia State Board of Elections, 889 F.2d 1352, 1358-59 (4th Cir.1989), the Fourth Circuit upheld a district court’s finding that Virginia’s appointive system for selection of school board members did not violate Section 2 of the Voting Rights Act. That is, the Court of Appeals agreed with the district court’s conclusion that, despite the existence of a “significant disparity” between the percentage of blacks in the population and the percentage of blacks on the school board, “[t]he evidence cast considerable doubt on the existence of a causal link between the appointive system and black un-derrepresentation in Buckingham and Halifax counties.” Id. at 1359. Rather, the disparity arose from the fact that “although blacks comprise a large portion of the population, they are not seeking school board seats in numbers consistent with their percentage of the population.” Id. at 1358, quoting, Irby v. Fitz-Hugh, 693 F.Supp. 424, 434 (E.D.Va.1988).
Finally, in Salas v. Southwest Texas Junior College District, 964 F.2d 1542 (5th Cir.1992), Hispanic voters challenged the use of an at-large system, as opposed to single member districts. The Fifth Circuit held that “the district court’s ultimate finding that the cause of Hispanic voters’ lack of electoral success is failure to take advantage of political opportunity, rather than a violation of § 2,” was not clearly erroneous. Id. at 1556.[5] Noting that evidence introduced at trial showed that Hispanic voter turnout was roughly seven percentage points below that of Anglo-Saxon whites, the Court of Appeals agreed that “[o]bviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote.” Id.[6]
*312 2.
We agree that Section 2 plaintiffs must show a causal connection between the challenged voting practice and the prohibited discriminatory result. Ortiz’s argument to the contrary is without legal foundation, devoid of endorsement in existing caselaw and the legislative history of Section 2 of the Voting Rights Act, and is not supported by evidence. In the present case, the district court properly considered whether or not Pennsylvania’s non-voting purge statute[7] caused the discrimination of which Ortiz complained.
Ill
A.
Ortiz argues that the district court erred in holding that, under the totality of the circumstances, Ortiz had “failed to demonstrate that the purge law interacts with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives.” Ortiz, 824 F.Supp. at 539.[8] As previously observed, the ultimate question of whether a challenged electoral procedure has a discriminatory effect is a question of fact which we review for clear error. See, supra, Section 11(A).
The district court made extensive findings with respect to the aforementioned objective factors delineated in the Senate Judiciary Committee Report. The district court found that there was racially polarized voting in Philadelphia, Ortiz, 824 F.Supp. at 532-33, and a “general pattern” of racial appeals in some Philadelphia political campaigns. Id. at 536-37. The court found that there were “substantial socioeconomic disparities among African-American, Latino and white residents of the City of Philadelphia, which affect the ability of these minority groups to participate in the political process and to elect their candidates of choice.” Id. at 535.[9] In addition, the court found that the needs of minority citizens have not always been adequately addressed by city officials, and that this factor, as well as the impact of various socioeconomic factors, could influence minority participation in the political process. Id. at 538.
Nevertheless, the district court found that there was no evidence of historical voting-related discrimination infringing upon the rights of Latinos or African-Americans to vote. Id. at 531-32. There was no evidence of discrimination in the candidate slating process that denied minority candidates equal access to the political process. Id. at 533. Nor was there evidence that minorities experience difficulty in electing representatives of their choice. Id. at 537-38.[10]
Finally, the district court found that the policy reasons underlying the City’s imple *313 mentation of the voter purge were substantial and were based upon a valid state interest of ensuring that elections in Philadelphia are not plagued with fraud. Id. at 538-39.
Ultimately, the district court concluded that Ortiz had failed to establish a per se violation of Section 2:
Plaintiffs have failed to demonstrate that the purge law interacts with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives, particularly since it is undisputed that the purge procedure is administered fairly and that there is ample opportunity for purged voters to re-register to vote. Although it is clear that the operation of the purge law removes African-American and Latino voters from the voter registration rolls at higher rates than white voters, this disproportionate impact does not rise to the level of a per se violation of § 2, even when considered in light of the court’s findings of the existence of racially polarized voting, socioeconomic disparities in education, employment and health, racial appeals in some elections, and the failure of the City in some instances to address the needs of minority citizens. While it is clear that these factors may contribute to decreased minority political participation rates, plaintiffs’ evidence simply does not justify the conclusion that the purge law is the dispositive force in depriving minority voters of equal access to the political process in violation of § 2.
Ortiz, 824 F.Supp. at 539.[11]
B.
We hold that the district court did not err in concluding that Ortiz had failed to show that Philadelphia’s minority population has had less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, as a result of Pennsylvania’s purge statute.
The Supreme Court has stated categorically that the right to vote is of the very essence of democratic society. Shaw v. Reno, — U.S. -, -, 113 S.Ct. 2816, 2822, 125 L.Ed.2d 511 (1993), quoting Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). Although we are mindful of the fact that it was not until relatively late in our nation’s history that this right was extended to every American citizen, without regard to race, we note that the Fifteenth Amendment, the Voting Rights Act, and numerous judicial decisions all have sought to raze any enduring historical bastions of state-administered voter discrimination.
Here, however, it is not the State which prevents citizens from exercising their right to vote, from participating in the political process, and from electing representatives of their own choosing. We are not confronted with an electoral device—such as “race-neutral” literacy tests, grandfather clauses, good-character provisos, racial gerrymandering, and vote dilution—-which discriminates against minorities, which has no rational basis, and which is beyond the control of minority voters. Rather, we are faced with the fact that, for a variety of historical reasons, minority citizens have turned out to vote at a statistically lower rate than white voters.[12]
[[Image here]]
*314 As we read Ortiz’s complaint, the entire document is drawn to allege that Pennsylvania’s purge statute “caused” the disparate purge rates between Philadelphia’s white and minority communities. Yet, there is nothing before us, not even one iota of evidence introduced at trial or present in the record, which would establish that fact, despite the claims made by the dissent.
On the contrary, it is well established that purge statutes are a legitimate means by which the State can attempt to prevent voter fraud.[13] More importantly, registered voters are purged—without regard to race, color, creed, gender, sexual orientation, political belief, or socioeconomic status—because they do not vote, and do not take the opportunity of voting in the next election or requesting reinstatement.[14]
It is true that in certain years minority voters have turned out in proportionately lower numbers than have non-minority voters. But the purge statute did not cause the statistical disparities which form the basis of Ortiz’s complaint. We agree with the Fifth Circuit that “a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote.” Salas v. Southwest Texas Junior College District, 964 F.2d 1542, 1556 (5th Cir.1992).
c.
Section 2 of the Voting Rights Act requires minority claimants to prove that they “have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” Chisom, v. Roemer, 501 U.S. 380, 397, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348 (1991). That is, Section 2 plaintiffs must demonstrate that they had less opportunity both (1) to participate in the political process, and (2) to elect representatives of their choice. In Chisom, the Supreme Court stated:
Any abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election.... [Hjowever, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process.
501 U.S. at 397, 111 S.Ct. at 2365 (holding that state judicial elections fall within the scope of Voting Rights Act).
In contrast to the situation discussed by the Court in Chisom, here the district court not only made a finding of minority participation in the political process, Ortiz, 824 *315 F.Supp. at 539, but it also made an explicit finding of fact that Philadelphia’s minority population has not had difficulty electing minority representatives. Id. at 537-38. In fact, despite the dissent’s charges, there is no evidence in the record that minorities have been denied fair access to the political process in the City of Philadelphia, nor is there any evidence that the purge law “impairs their ability to influence the outcome of an election.” Chisom, 501 U.S. at 397, 111 S.Ct. at 2365.[15] To the contrary, a minority candidate, Wilson Goode, had won election to two four-year terms as Mayor of the City of Philadelphia, in 1983 and 1987, and the district court found that the Philadelphia City Council consistently has had a strong minority presence, including seven of the seventeen council seats at the time the district court issued its opinion.[16]
These findings by the district court are not clearly erroneous. Thus, we conclude that Ortiz, in failing to establish causation, has also failed to satisfy both elements of a Section 2 cause of action and, accordingly, has failed to establish a basis upon which his requested relief could be granted.
IV
The dissent argues at great length that societal conditions — discrimination in housing, education, wages, etc. — constitute a totality of the circumstances with which the practice (the purge law) interacts to create inequality (discrimination). The dissent, however, has overlooked the fact that the individuals to whom the purge law applies apparently have surmounted and overcome the societal disadvantages which it emphasizes, and have registered to vote at least once, if not more often.[17] Had they continued to do so, the purge law could not have affected them, inasmuch as the purge law *316 operates against only those who have registered to vote at least once, but then do not vote or register again. Conversely, if individuals have never registered and have never voted, the purge law still could not be applied to them because, as stated, the purge law affects only those who have once registered to vote.
*315 [[Image here]]
*316 Once having registered to vote, such individuals could not have been impeded by the practices which Ortiz claims have diluted their participation in the voting process.[18] This may very well account for the fact that no reported case has ever dealt with a nonvoting purge law as a racially discriminatory instrument in violation of Section 2 of the Voting Rights Act, and the dissent, accordingly, has been unable to cite any such authority. It certainly accounts for the result which the district court reached in the present case, and which we reach today. The societal disadvantages cited by the plaintiffs and the dissent just are not relevant. They are not relevant because they could not have diluted voting by a registrant or voter who had already registered and/or voted. As previously stated, the record reveals no link between the societal conditions and factors recited by the dissent and the electoral practice (i.e., the purge law) challenged by Ortiz.
In addition, the dissent argues at length that “the City did not prove ‘the need’ for Pennsylvania’s non-voting purge law,” (Dissent at 331), and that the City properly should have been required to do so. The dissent derives such a requirement from footnote 119 in the Senate Judiciary Committee’s Report,[19] and its own analogy to Title VII disparate impact law.[20] However, no relevant authority has been cited for imposing such a burden upon the City.[21] Even if there were such a requirement, we are satisfied that a review of the record and present reality demonstrates that the City’s purge statute meets an important and legitimate civic interest and is needed to prevent electoral fraud.
Notably, and of recent date, Philadelphia’s Senate election, in which the Democratic candidate ostensibly had prevailed, was invalidated on the basis of findings that absentee votes cast by non-residents and deceased voters had been fraudulently obtained and counted. See Marks v. Stinson, No. 93-6157, *317 1994 WL 47710 (E.D.Pa. Feb. 18, 1994), vacated in part, 19 F.3d 873 (3d Cir.1994). Indeed, as recently as April 13, 1994, the Philadelphia Inquirer reported under the headline, “City Purging 2d District Voter Rolls,” that at least twenty-two individuals were “purged” because they either had died or no longer lived in the district but had, nevertheless, east votes in the most recent election — the very fraudulent acts which the purge statute was designed to overcome.[22] Even the dissent acknowledges that electoral fraud has been a part of Philadelphia’s landscape for over 100 years. See Dissent op. at 333 n. 22.
V
In its final analysis, the dissent’s rhetoric still fails to bridge the gap between the societal disadvantages which it catalogues at great length, and the purpose and effect of Philadelphia’s non-voting purge act. Once again, we emphasize that the sole purpose of that act is to prevent the very electoral fraud which can diminish the voting power of all citizens who have registered and voted, including registered and voting members of minority groups. Despite the dissent’s attempt to attribute society’s voting ills to the purge act, neither the plaintiffs nor the dissent have been able to demonstrate that the purge act has had any effect whatsoever on any rights which, are protected by Section 2 of the Voting Rights Act.
The dissent repeatedly charges the purge act with discrimination against minorities. See, e.g., Dissent op. at 321, 337, 340. Yet, not one word appears in the dissent to substantiate such charges. Of even greater importance, the entire record is devoid of evi-deuce which could support such a conclusion. It is not enough, in an attack on a non-voting purge law, simply to express distress over the very real societal disadvantages that afflict some members of minority groups. Such sympathy and concern, though shared by all of us, are extraneous to the legal challenge mounted by Ortiz.
The dissent’s single-minded focus on societal disadvantages might be entitled to somewhat greater weight in a suit challenging, not Philadelphia’s purge act, but, perhaps, more generally, Philadelphia’s voter registration procedures themselves. It is apparent to us that the dissent, while charging the purge act with a discriminatory effect, essentially is railing against registration procedures not at issue here.
For example, if Ortiz had alleged that, because of disadvantages in education, housing, health, income, and the like, minority citizens could not afford to travel to registration centers, or in some other way avail themselves of registration opportunities, the dissent’s essay might have some meaning. But Philadelphia’s voter registration laws, as a whole, are not under attack here. The sole statute assailed by Ortiz is § 623-40, the non-voting purge act. That act operates only after a would-be registrant has overcome whatever societal obstacles, such as those detailed in the dissent, were in his path.
When, if ever, a claimant mounts an attack against Philadelphia’s voter registration provisions, then and only then will it be the time to assess the legality of such procedures in light of the societal disadvantages highlighted by the dissent. This case, this appeal, and our opinion, however, are not the time or place for such a discussion. Until proofs can *318 be assembled — and we can think of none that are relevant — to establish that a benign and neutral non-voting purge law discriminates against a particular class, we decline to invalidate such a statute.
YI
We hold that the district court did not err in denying Ortiz’s request for declaratory and permanent injunctive relief. Therefore, we will affirm the district court’s June 1, 1993 order granting judgment in favor of the City.
Costs will be taxed against the appellant, Ortiz.

. Section 623-40 provides as follows:
During each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the commission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two immediately preceding calendar years, and that his registration will be can-celled if he does not vote in the next primary or election or unless he shall, within ten days of the next primary or election, file with the commission, a written request for reinstatement of his registration, signed by him, setting forth his place of residence. A list of the persons to whom such notices shall have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members. At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be cancelled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The official registration application card of an elector who has registered may qualify as a reinstatement of his registration or a removal notice. The cancellation of the registration of any such elector for failure to vote during two immediately preceding calendar years shall not affect the right of any such elector to subsequently register in the manner provided by this act.
Whenever the registration of an elector has been cancelled through error, such elector may petition the commission for reinstatement of his registration not later than the tenth day preceding any primary or election, and after a hearing on said application, if error on the part of the commission is proved, the commission shall reinstate the registration of such elector.

. Ortiz’s expert testified to the following disparities in the rates at which white and minority voters in the City of Philadelphia were slated to be purged, and estimated rates at which they actually were purged:
[[Image here]]

. Ortiz has abandoned his claims under the United States Constitution and state law. In addition, we note that Ortiz’s complaint was filed with respect to the 1991 election. Of course, both the purge preceding that election, and the election itself, have already occurred. Nevertheless, neither of the parties have argued that the issues presented on appeal are moot, nor could they so argue, inasmuch as Ortiz’s complaint is "capable of repetition yet evading review.” Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

. As we read the district court’s opinion, we construe it to mean that where, as here, a Section 2 plaintiff seeks to abolish or invalidate a particular election practice, such as a purge law, and pinpoints the particular practice in its complaint, the plaintiff necessarily must demonstrate and establish by evidence that the particular practice causes the alleged discrimination.

. The dissent's attempt to distinguish Salas misses the mark. See Dissent op. at 329-30. Although the Court of Appeals in Salas did address the issue of whether or not a minority group which constitutes a majority of registered voters may bring a claim under Section 2 of the Voting Rights Act, concluding that it could, the court proceeded to consider the validity of the plaintiffs’ claim on the merits, and stressed the need for the plaintiffs to establish that the challenged practice (i.e., the at-large system) caused the electoral dilution.
After delineating the court’s responsibility to analyze the impact of a challenged practice, and the plaintiffs' burden to prove that the practice denied them the opportunity to elect their preferred representatives, the Fifth Circuit noted that ”[u]nderlying these functions of the court and the plaintiffs in a multimember district vote dilution case is an inquiry into causation— whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives." 964 F.2d at 1554.

. We note that the legislative history of the 1982 amendment also supports this construction of Section 2. For example, the Senate Judiciary Committee Report summarized the amendment’s effect as follows:
If as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice, there is a violation of this section.
Sen. R. at 28, 1982 U.S.C.C.A.N. p. 206 (emphasis added). We read this language to provide that Congress intended that any alleged denial of equal access to the political process be the “result of the challenged practice or structure.”
The Report also stresses that the ultimate test for both permanent structural barriers to political participation, as well as episodic barriers, would be the standard enunciated by the Supreme Court in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and codified by Congress in its 1982 amendment of Section 2: “whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their choice.” Sen.R. at 30, 1982 U.S.C.C.A.N. p. 208 (emphasis added) (accompanying footnote discussed below). This language informs us that the Senate Judiciary Committee expected that courts ultimately would focus on the challenged procedure and its causal effects on equal opportunity to participate in the political process.
Finally, the footnote accompanying the above-quoted text states that "purging of voters could produce a discriminatory result if fair procedures were not followed, Toney v. White, 488 F.2d 310 (5th Cir.1973), or if the need for a purge were not shown or if opportunities for re-registration *312 were unduly limited.” S.Rep. at 30 n. 119, 1982 U.S.C.C.A.N. p. 208. Thus, the Committee acknowledged that a purge statute which, itself, produced a discriminatory result, by virtue of the manner in which it was administered, might violate Section 2 of the Voting Rights Act. Implicitly, however, the Committee recognized that a purge statute which was administered fairly, and in an even-handed manner, would not run afoul of the law.

. See, supra, note 1.

. Ortiz challenges a number of the district court’s underlying factual findings. In particular, Ortiz argues that the district court erred in finding that the City's failure to send out bilingual "intent to purge" notices, in violation of an order in Arroyo v. Tucker, 372 F.Supp. 764 (E.D.Pa.1974), did not have a discriminatory impact on the abilily of Latino voters to equally participate in the political process. Ortiz also claims that the district court erred in finding that minority voters did not suffer a disproportionate burden of re-registration, and that the disproportionate placement of older voting machines in minority wards did not have a discriminatory impact on minority voters.
None of these findings of fact were clearly erroneous. In any event, they are subsumed by the district court's ultimate factual determination that Ortiz had failed to establish that the purge statute caused minority voters to be purged at a disproportionate rate.

. In particular, the district court found disparities in the rates of educational attainment, home ownership, housing discrimination, health care coverage, employment, and income among African-Americans and Latinos in comparison to the general population of the City of Philadelphia. The court also found that minority voters in Philadelphia do not exercise their right to vote to the same extent as white voters, which in part may be attributable to discrimination and the overall socioeconomic status of minorities in Philadelphia. Ortiz, 824 F.Supp. at 533-35.

. See, infra, note 16, and accompanying text.

. Examining the district court’s opinion as a whole, it is apparent that the court's use of the phrase “the dispositive force” means a cause which, in that context, would be legally disposi-tive.

. The following statistics, upon which the district court relied, Ortiz, 824 F.Supp. at 536 (E.D.Pa.1993), are illuminative:

. For example, the Fourth Circuit stated as follows in rejecting a constitutional challenge to Maryland's voter purge statute:
The statute in question here is designed to curb vote fraud. It removes from the registered voter list those who have moved without notifying the voter registration board, those who have died when the city has not been notified of such deaths, and those who have become disqualified as a result of conviction for infamous crime if the city did not receive notice of such convictions. Without removing the names, there exists the very real danger that impostors will claim to be someone on the list and vote in their places. And the absent voting statutes open the door for vote fraud by this means. Accordingly, keeping accurate, reliable and up-to-date voter registration lists is an important state interest.... Even considering that re-registration may be somewhat burdensome, it is a small price to pay for the prevention of vote fraud.
Hoffman v. Maryland, 928 F.2d 646, 649 (4th Cir.1991). See also Rosario v. Rockefeller, 410 U.S. 752, 761, 93 S.Ct. 1245, 1251, 36 L.Ed.2d 1 (1973) (recognizing that "preservation of the integrity of the electoral process is a legitimate and valid state goal”); Barilla v. Ervin, 886 F.2d 1514, 1523-24 (9th Cir.1989) (recognizing legitimate state interest in preventing electoral fraud). See, infra, discussion at 316-17.

. We note that the procedures for re-registering to vote are identical to those for registering in the first place; therefore, they are no more complicated, burdensome, or discriminatory than the requirement of initial registration. See Williams v. Osser, 350 F.Supp. 646, 653 (E.D.Pa.1972) (recognizing that "[t]he burden [of re-registration under the non-voting purge law] does not nearly approach the requirements of initial registration.")

.The dissent quotes footnote 117 from the Senate Judiciary Committee Report as follows: "[E]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff’s showing through other factors that the challenged practice denies minorities fair access to the process.” Dissent op. at 331-32. Ortiz, however, has failed to prove that "the challenged practice [i.e., the purge statute] denies minorities fair access to the process."

.The district court included in its opinion the following germane statistics with respect to minority representation in the Pennsylvania legislature:

.Thus, the dissent’s reliance on Mississippi State Chapter, Operation Push v. Allain, 674 F.Supp. 1245 (N.D.Miss.1987), aff'd, 932 F.2d 400 (5th Cir.1991), is misplaced. See dissent op. at 327-29. In that case, Mississippi's onerous dual registration requirement, and prohibition on off-site voter registration, were the causes of black voters’ registering at lower rates than white voters. In the present case, no part of the purge statute prevents minority voters from registering to vote and from actually voting. In fact, as mentioned in text, the statute only applies to those voters who already have registered to vote.

. See, supra, note 14.

. Footnote 119 provides in relevant part as follows: "purging of voters could produce a discriminatory result if fair procedures were not followed. Toney v. White, 488 F.2d 310 (5th Cir.1973), or if the need for a purge were not shown or if opportunities for re-registration were unduly limited.” (Emphasis added.) In the present case, none of these qualifications are relevant, nor has Ortiz proved the presence of any of them.

. In Title VII disparate impact cases, plaintiffs are permitted to come forward with evidence of less discriminatory alternatives to refute their employers’ business justifications because such evidence "would belie a claim by [employers] that their incumbent practices are being employed for nondiscriminatory reasons.” Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 660-61, 109 S.Ct. 2115, 2127, 104 L.Ed.2d 733 (1989) (recognizing that employer’s practice need not be "essential” or "indispensable” to the employer’s business for it to pass muster as a business justification). Here, there is no allegation, no implication, no imputation, and, of greatest importance, no evidence, that the purge statute was enacted, or is being employed, by the City of Philadelphia for anything but nondiscriminatory reasons.
Moreover, even if the dissent was correct in drawing an analogy to Title VII jurisprudence— an analogy which is inapposite—we note that in Title VII cases, it is the plaintiff, not the defendant, as the dissent would have it, see Dissent op. at 334, who, at all times, bears the burden of proving discrimination. St. Mary’s Honor Center v. Hicks, — U.S. -, -, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir.1991). In the present case, Ortiz has failed to carry any such burden.

. In Wesley v. Collins, 791 F.2d 1255, 1261 (6th Cir.1986), the Sixth Circuit did not require the State of Tennessee to show that its statute disenfranchising convicted felons was "necessary.” Nor could the State have made such a showing were it required to do so. Rather, the Court of Appeals held:
[T]he existence of other social and political factors present in this case leads to the inescapable conclusion that the Voting Rights Act was not violated. Chief among those factors was the state’s legitimate and compelling rationale for enacting the statute here in issue.
Id. at 1261.

. That article recited in part:
• The Board of Elections has begun purging the Second Senate District voting rolls of people who no longer live there — including a woman whose vote was recorded after she died and another whose vote was cast while she lived on a Greek island.
• Election officials said the 22 names — including an individual who city investigators found living in New Jersey — would immediately be purged from computerized voting rolls and notification would be delivered to the addresses on their voter registration.
• Among the 22 people being purged in the Sixth Division of the 42d Ward is one individual who has been living in Las Vegas for two years, though a vote was cast in her name in the November election without her knowledge, and a second individual who said he did not vote in any of the five Philadelphia elections in which ballots were cast for him since 1988.
• Between 1988 and 1993, for example, at least 60 improper ballots were cast in the Sixth Division of the 42d Ward, 27 by machine and 33 by absentee ballot.
Mark Fazlollah, City Purging 2d District Voter Rolls, Phila. Inquirer, April 13, 1994, at A1, A7.